R. D. and Ida M. CRAVENS, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 6138.

United States Court of Appeals
Tenth Circuit.

Nov. 25, 1959.

896

C. Larry McLane, Norman, Okl. (Edward G. Sievers and Graham Loving, Jr., Oklahoma City, Okl., and Mosteller, Fellers, Andrews & Loving, Oklahoma City, Okl., of counsel, were with him on the brief), for petitioners.

James P. Turner, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, and Helen A. Buckley, Attys., Dept. of Justice, Washington, D. C., were with him on the brief), for respondent.

Before BRATTON, LEWIS, and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Petitioners, husband and wife, challenge a Tax Court decision disallowing a $50,000 business expense deduction claimed for the calendar year 1953 on their joint return which was made on a cash basis. The item represents a disbursement made on December 29, 1953, to cover future deliveries of cattle feed. The Tax Court held that this was a deposit intended to be applied against future orders and was not an ordinary and necessary business expense deductible in 1953.[1]

Cravens raised registered Hereford cattle on an Oklahoma ranch. He had built up his herd from 148 animals in 1946 to 730 animals in 1953. Because of a drought, he was unable to raise sufficient hay and grass on his ranch in 1952 and 1953 and had to depend on purchased feed, much of which he obtained from Superior Feed Mills.[2] The drought situation was such that as the end of 1953 approached Cravens was confronted with the problem of whether to dispose of his herd. In that year he had realized a substantial capital gain from the sale of property.[3] Cravens testified that he decided that "if I could make a deal for a year's feed that I'd keep these cattle over through the year '54 and see if the drouth broke * * *." He consulted with his foreman and determined that 745 tons of certain types of feed would be needed to carry the stock through 1954 and into January or February of 1955. Cravens sought to buy from Superior this feed for future delivery at the then market price. Superior declined because of market conditions and insisted upon the price applicable on each delivery date. Cravens then offered Superior an immediate payment of $50,000 in return for guaranteed deliveries. Because of the drought conditions Superior declined to guarantee deliveries but agreed that upon the payment of that sum Cravens would receive preferential treatment. A contract was executed whereby Superior sold and Cravens bought six listed items of cattle feed in quantities varying from 20 to 300 tons and totaling 745 tons. Delivery dates were not fixed. The prices were to be those prevailing on the delivery dates. Cravens sent Superior his $50,000 check which was cashed by Superior before the end of 1953.[4]

The drought worsened in 1954 with the result that because of the feed situation Cravens sold 514 head of cattle in November of that year. The 1954 deliveries under the Superior agreement were approximately $37,000. It was stipulated that the last of the feed to extinguish the account was delivered in October 1955.[5]

The Tax Court held that the $50,000 disbursement was a deposit and not a payment which would result in an allow-

1. The Tax Court opinion is reported at 30 T.C. 903.

2. In 1952 his feed expense was $61,895.24 of which $30,893.81 represented purchases from Superior. In 1953, in addition to the expenditure of the $50,000 at issue, his feed expense totaled $74,496.24, of which $38,196.23 represented amounts of feed purchased from Superior.

3. The net income as disclosed by the return was $78,824.98 and as adjusted by the Commissioner after the disallowance of the $50,000 disbursement and items not here under consideration was $142,388.53.

4. The contract stated that the terms were according to a letter dated December 22, 1953. In that letter Superior said:

"Prices will be those in effect on the date of shipment and you may have the privilege of varying the quantities from one item to the other to any reasonable extent. This contract however, will insure you your requirements when and as you need them." The president of Superior testified: " * * * I was not committing myself to any definite price. The only commitment that I was making is that I was going to give him preferential treatment and he was going to get feed ahead of anyone else if it got down to a serious situation like that in light of the fact that I had his money * *."

5. The Tax Court found that the full quantities ordered were not delivered until in 1956. The total cost to Cravens exceeded $50,000.

able deduction. The Commissioner contends that such holding is a finding of fact which is not clearly erroneous and which may not be disturbed on review.[6] The Supreme Court has said that whether an expenditure is directly related to a business and whether it is ordinary and necessary are "pure questions of fact in most instances."[7] Here the basic facts are not in controversy. The conclusion reached by the Tax Court was dispositive of the case. Whether that conclusion be styled an ultimate fact, a determination of a mixed question of fact and law, or a decision on a question of law, there is the issue of the deductibility by a cattle raiser of a disbursement made to prepay the cost of feed to be used in the future. A consideration of the nebulous distinctions between findings of fact and conclusions of law is not helpful. There are presented no conflicts of evidence or inference. We must take the record and determine whether a mistake has been made.

■ Cravens concedes that the tax implications of the transaction influenced his conduct. Tax motive is unimportant if the taxpayer does that which the law permits.[8] The existence of an intent to avoid taxes has only the effect of requiring a careful scrutiny of the forms used for such accomplishment.[9]

Section 23(a)(1)(A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a)(1)(A), provides that in computing net income there shall be allowed as deductions "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." Here the disbursement was made within the tax year for which the deduction was claimed and the feed was required in the cattle raising operations of the taxpayer. The only issue is whether the use of the feed in future years destroys the deductibility of the disbursement in the year when it was made.

The Tax Court referred to the disbursement as a deposit and said that there is no payment "where there is merely a deposit as security for payment." The facts do not sustain a finding that this disbursement was security for payment. Superior had never demanded security in its dealings with Cravens. It did not demand security in connection with this transaction. What Superior did was to promise preferential treatment in return for an advance payment of $50,000.

Under the contract the dates of delivery were not fixed, the prices were to be those prevailing on the dates of delivery, the quantities could have been varied "to any reasonable extent," and if the advance payment had exceeded the ultimate cost, Cravens would have been entitled to a refund. These factors are urged as establishing that there was no firm contract of sale and purchase and, hence, no obligation to pay the $50,000 in 1953. The answer is that the contract was binding and carried out by the parties.

■ As the payment was made in 1953, the question is whether the disbursement was for an ordinary and necessary expense of that year when the items purchased were used and intended to be used in future years. It has been said that to be "ordinary and necessary" the expenditure must have some reasonably proximate relation to the customary conduct of the taxpayer's business.[10] An

---

6. Cf. Commissioner of Internal Revenue v. Scottish American Investment Co., Ltd., 323 U.S. 119, 124, 65 S.Ct. 169, 89 L.Ed. 113; Friend v. Commissioner of Internal Revenue, 10 Cir., 198 F.2d 285, 287, 46 A.L.R.2d 761.

7. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171.

8. Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Diamond A Cattle Company v. Commissioner of Internal Revenue, 10 Cir., 233 F.2d 739, 742.

9. Continental Oil Co. v. Jones, 10 Cir., 113 F.2d 557, 561, certiorari denied 311 U.S. 687, 61 S.Ct. 64, 85 L.Ed. 443.

10. Mertens, Law of Federal Income Taxation, Vol. 4, § 25.09, Chap. 25, p. 24.

expense may be ordinary even though it happen but once in the taxpayer's lifetime.[11] For an expenditure to be necessary it is not essential that there be an absolute and compelling reason. When the expenditure is appropriate and helpful to the taxpayer's business, the courts are loath to override the taxpayer's judgment.[12]

Cravens faced the problem of disposing of at least part of his herd or arranging for feed. A drought is not an unfamiliar situation to ranchers and cattlemen in the western part of the United States. There is no intimation that Cravens' decision to buy feed rather than sell his stock was an unusual decision for a cattle raiser to make in like circumstances. While the drought may have been out of the ordinary, the avoidance of a distress sale by prepayment for feed to assure preferential delivery is reasonable and has a direct relation to the taxpayer's business. By paying the $50,000 to Superior in advance, Cravens secured an advantage which, so far as the record shows, was not otherwise obtainable. When a commodity, such as cattle feed, is in short supply, an assurance of preferential delivery is important to a man who needs that commodity to stay in business.[13]

 The Commissioner suggests that as the benefit of the $50,000 disbursement extended beyond the tax year it constituted a capital investment. While it is not easy to draw the line between capital investments and current expenses,[14] this payment was not for an addition, a betterment, or an advantage of a permanent character [15] but for the day by day supply of food without which the herd could not survive. The fact that the expenditure covered feed for more than a twelve-month period does not convert it into a capital expenditure, especially where, as here, the length of the drought was uncertain and the deterioration of pasture conditions required a sale of more than 75% of the herd.

Cases denying the deductibility of advance payments are distinguishable from the case at bar.[16] We do not have here a situation of fixed liabilities payable ordinarily in periodic installments but instead a situation of a payment to forestall the distress liquidation of property essential to the continuance of the taxpayer's business. Indeed, the case for the taxpayer is stronger than that considered in Ernst v. Commissioner of Internal Revenue, 32 T.C. 181, where the Tax Court allowed the deduction by a poultry raiser of disbursements for feed in the year when made even though the delivery was not to be made in that

11. Deputy v. du Pont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416.

12. Welch v. Helvering, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212.

13. The fact that the drought continued and that Cravens was forced in the fall of 1954 to sell more than 75% of his herd at "fifty cents on the dollar" does not affect the treatment of the disbursement. Deductibility does not depend on ability to foretell weather conditions.

14. Cf. United States v. Akin, 10 Cir., 248 F.2d 742, 744, certiorari denied 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532; Hotel Kingkade v. Commissioner of Internal Revenue, 10 Cir., 180 F.2d 310, 312.

15. Cf. Duffy v. Central Railroad Company of New Jersey, 268 U.S. 55, 63, 45 S.Ct. 429, 69 L.Ed. 846.

16. Among such cases are Galatoire Bros. v. Lines, 5 Cir., 23 F.2d 676 (advance payment of rent); Main & McKinney Bldg. Co. of Houston, Tex. v. Commissioner of Internal Revenue, 5 Cir., 113 F.2d 81, certiorari denied 311 U.S. 688, 61 S.Ct. 66, 85 L.Ed. 444 (advance payment of rent); Baton Coal Co. v. Commissioner of Internal Revenue, 3 Cir., 51 F.2d 469, certiorari denied 284 U.S. 674, 52 S.Ct. 129, 76 L.Ed. 570 (advance payment of rent); Duffy v. Central Railroad Company of New Jersey, 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846 (additions to leased property); Commissioner of Internal Revenue v. Boylston Market Ass'n, 1 Cir., 131 F.2d 966, 144 A.L.R. 528 (advance payment of insurance premiums); and Robertson v. Steele's Mills, 4 Cir., 172 F.2d 817, certiorari denied 338 U.S. 848, 70 S.Ct. 86, 94 L.Ed. 519 (capital expenditure).

year.[17] In Ernst there was no condition such as the drought which confronted Cravens and no hazard of a distress liquidation. The fact that Cravens had the possibility of a refund if the cost of the 745 tons of feed was less than $50,000, an eventuality which did not occur, did not make his contractual obligation any less binding than that of Ernst. Cravens was bound to buy and did buy the agreed quantity. By his advance payment Cravens, unlike Ernst, secured the promise of preferred deliveries.

There remains to be considered the question of whether the allowance of the deduction violates § 41 or § 43 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 41, 43. Section 41 provides that net income shall be computed on the basis of the taxpayer's annual accounting period in accordance with the method of accounting regularly employed by the taxpayer but if the method so employed "does not clearly reflect the income" then such method shall be used as in the opinion of the Commissioner does clearly reflect the income. As there is no issue here of accounting period or of method, no reason exists for application of this section. The sole question is the deductibility of a specific item.

■ So far as pertinent, § 43 requires that deductions be taken in the year when paid "unless in order to clearly reflect the income the deductions * * * should be taken as of a different period." The Commissioner urges that the allowance of the deduction in 1953 results in a distortion of income for that year.[18]

In Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725, the taxpayer, which was on an accrual basis, deducted certain processing taxes which it had impounded but not paid to the Collector and which were in litigation and later refunded to the taxpayer's customers. The Commissioner disallowed the deduction. The taxpayer contended that the disallowance resulted in a distortion of its income and that under § 43 the Commissioner was required to make an exception to the general rule of accounting periods if it would be unfair not to treat the transaction on the basis of the long-term result. The Court, after commenting on the history of the legislation which resulted in the adoption of the qualifying clause of § 43, said that "the purpose of inserting the qualifying clause was to take care of fixed liabilities payable in fixed installments over a series of years" and that the intent was not to upset the doctrine that cash receipts and cash payments "should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer."[19]

In the Security Mills case the taxpayer, which was on the accrual basis, had receipts which were offset by a liability which did not accrue until a later year. In the case at bar the taxpayer was on the cash basis and made a disbursement for supplies which were not delivered until a later year. The application of § 43 for the benefit of the taxpayer was denied in the Security Mills case. On the same reasoning, the Commissioner is not entitled to the benefit of § 43 in this case.

■ In the case of farmers and cattle raisers the use of a transactional basis for the computation of income would bring confusion into the federal tax system. The treatment of the cost of seed, fertilizer, and feed purchased in one year for use in the next year is simple if the deduction is allowed when paid if the

---

17. In the Ernst case, as in this case, the delivery dates were uncertain. In Ernst the quantity was all a certain sum of money would buy. Here the quantity is specified but the ultimate cost is uncertain.

18. The deficiency assessment was $38,995.-04. Counsel for the Commissioner compute the overall tax benefit to the taxpayers, if their position is sustained, to be slightly over $37,000.

19. 321 U.S. 285–286, 64 S.Ct. 598.

cash basis applies or when incurred if the accrual basis is used.[20] If each transaction must be analyzed to determine whether a distortion of income will result from the allowance of a business expense deduction, § 43 is, in our opinion, given a meaning which Congress did not intend.

Reversed.

---

20. Cf. Prentice-Hall, Federal Taxes, Vol. 2, § 11,918, Prepaid Expenses, slip sheet 1/1/59.