Tim W. Lillie and Ingeborg V. Lillie, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Pearl Lillie, Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 5040–63, 2209–64. Filed October 14, 1965.

*Charles A. Pinney, Jr.,* for the petitioners.
*Robert L. Gnaizda,* for the respondent.

Dawson, *Judge:* In these consolidated proceedings respondent determined the following deficiencies and additions to tax:

| Petitioners | Docket No. | Year | Tax | Additions to tax | |
|---|---|---|---|---|---|
| | | | | Sec. 6651(a) | Sec. 6653(a) |
| Tim W. Lillie and Ingeborg V. Lillie | 5040–63 | 1956 | $1,228.88 | | $61.44 |
| | | 1959 | 4,200.80 | | 210.04 |
| | | 1960 | 2,546.69 | $254.17 | 127.33 |
| | | 1961 | 3,552.23 | | 177.61 |
| Pearl Lillie | 2209–64 | 1960 | 7,607.38 | | |

All issues except one in docket No. 5040–63 have been settled by the parties and will be given effect in the Rule 50 computation. The only issue remaining for decision, which is common to both proceedings, is whether large end-of-year payments made by petitioners to cattle-feeding companies are deductible as ordinary and necessary business expenses under section 162(a), I.R.C. 1954, in the year of payment rather than in the subsequent year during which feed and related services were supplied by the cattle-feeding companies.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are hereby found accordingly.

Tim W. and Ingeborg V. Lillie are husband and wife, residing in San Diego County, Calif. Pearl Lillie, mother of Tim, also resides in San Diego County, Calif. Since Ingeborg is a party to this action

only because she filed joint income tax returns with her husband, only Tim and Pearl will sometimes hereinafter be referred to as petitioners.

Petitioners keep their books and prepare their Federal income returns on a calendar year basis and on the cash receipts and disbursements method of accounting. For the taxable years 1956 through 1961 the petitioners filed their Federal income tax returns with the district director of internal revenue at Los Angeles, Calif.

Tim is a dentist, and during the years in issue he had a successful practice in the San Diego area. He reported net income from his dental practice as follows:

| Year | Amount |
|------|--------|
| 1956 | $26, 778. 25 |
| 1957 | 31, 490. 72 |
| 1958 | 28, 058. 91 |
| 1959 | 24, 647. 67 |
| 1960 | 10, 244. 54 |
| 1961 | 19, 115. 32 |

Tim reported net losses from a cattle business as follows:

| Year | Amount of net (loss) |
|------|----------------------|
| 1959 | ($29, 176. 83) |
| 1960 | (18, 458. 46) |
| 1961 | (6, 683. 84) |

Tim's aggregate net income from his dental practice for the years 1959 through 1961 was approximately $54,000 and his aggregate net loss from his cattle business for the same years was also approximately $54,000.

Pearl reported income in 1960 of $21,226.93, which included interest payments received from Tim in the amount of $18,444. On her 1960 income tax return she also reported a net loss from cattle operations of $20,402.12 of which $19,700 was due to cattle-feeding payments.

During the years 1959, 1960, and 1961 Tim fed cattle for profit in Imperial County, Calif. Pearl joined him in this venture in 1960 and both have actively engaged in the cattle business ever since.

The cattle owned by petitioners during these years were physically located in the commercial feedyards of Heber Cattle Feeders, Heber, Calif., and McCabe Cattle Co., on the Dahlia Canal near El Centro, Calif. McCabe and Heber are cattle-servicing companies whose principal source of income is derived from the sale of cattlefeeds and services to their customers. To increase sales, these companies perform such complete services that some cattle owners never see their stock. McCabe and Heber purchase cattle for their customers and direct shipment to the company yards. When the cattle arrive, they are unloaded, branded, dipped, and weighed. Bulls are dehorned and castrated. The cattle are also recorded and placed in proper

feeding pens. Throughout the months during which the cattle are being fattened, company employees mix the proper feeds and deliver them to the herds twice daily. After sale, the companies load the cattle and direct shipment to the purchasing meatpacking houses.

The value of such services is substantial, but, rather than reflect them as such when billing customers, companies engaged in the cattle-feeding business have developed the general practice of including the cost of services in the sales price of their feeds. The most frequently used feeds are silage, a basic feed used in the early growing stages, and finishing mixes, a name given to various blends of feed used to fatten steers to their maximum weight. The contents of these finishing feeds vary from company to company and can generally be said to grow more expensive as they contain those elements which add the greatest finishing weight to the steer.

Between December 13, 1959, and August 21, 1960, Tim maintained a herd of varying size at Heber Cattle Feeders, identified as lot No. 2. On December 21, 1959, Tim made a payment of $25,000 to Heber and received an invoice reading, in part, as follows:

for your purchase of the five hundred (500) tons of Number 1 feed for the cattle which you have placed with us to feed in our Lot #2 here at Heber Cattle Feeders.

    *        *        *        *        *        *        *

So that you may inform your bookkeeper or accountant of your transactions here in El Centro and Heber, I am listing below your account as of this date with us:

Feed (paid) _____500 tons, #1 mix_____ $25,000.00
                    (Stored in east warehouse—Heber)

By December 31, 1959, Tim's cattle had consumed at Heber only $657.65 of feed. During the year 1960 the cattle fed at Heber consumed $32,704.74 of feed and Tim paid an additional sum of $8,362.39 to Heber.

Between November 14, 1960, and May 13, 1961, Tim maintained two herds of varying size at McCabe Cattle Co., identified as lots 117 and 137. On November 18 and December 31, 1960, Tim made payments of $15,000 and $27,160 respectively to McCabe, who recorded these amounts as feed sold to Tim in its books. The cattle in lots 117 and 137 consumed $3,244.59 of feed in 1960 and $12,774.84 of feed in 1961 before being sold.

During 1961 Tim had a disagreement with the managers of McCabe Cattle Co. Since he thought he could obtain more favorable treatment at Heber, he decided to transfer all of his business there. Consequently, on or about July 10, 1961, some 2 months after the last of the cattle in lots 117 and 137 had been sold, McCabe gave Tim a check for $26,140.57, which represented the difference between Tim's payments, totaling $42,160, and the total amount ($16,009.94) of feed consumed

by lots 117 and 137 during 1960 and 1961.[1]  The termination of transactions between Tim and McCabe had not been envisioned the previous December when he made his advance payments.  No provision for the refund of the sums paid by Tim in November and December of 1960 had been made with McCabe.  The check issued by McCabe represented the "credit balance due and payable" to Tim as shown on McCabe's statement of account dated July 10, 1961.

Between July 5, 1961, and January 29, 1962, Tim maintained a herd of varying size at Heber, identified as lot No. 1.  Between November 8, 1961, and May 14, 1962, he kept an additional herd at Heber identified as lot No. 3.  On December 29, 1961, Tim made a payment of $52,520.23 to Heber.  The cattle in lots 1 and 3 consumed $10,344.01 of feed in 1961.  The balance of $42,176.22, credited to Tim's account on December 31, 1961, was used for feed and services supplied in 1962.

On December 31, 1960, Pearl owned approximately 133 head of cattle which were identified as lot 144 at McCabe Cattle Co.  On December 9, 1960, and December 30, 1960, Pearl made payments of $5,000 and $14,700 respectively to McCabe and these payments were recorded as sales of feed on McCabe's books.  Pearl's cattle consumed $495.25 worth of feed during 1960 and $4,822.01 in 1961.  Pearl joined Tim when he transferred his entire cattle business to Heber in 1961 and, as a result of this change, a check for $14,382.74 (the difference between Pearl's December 1960 payments and the total feed consumed by her cattle) was drawn by McCabe to Pearl on July 14, 1961.  No provision for refund had been made with McCabe in December 1960.  Pearl continued to raise cattle at the facilities of Heber Cattle Feeders during the remainder of 1961.  Petitioners received monthly statements from Heber and McCabe which showed the cost of the feed consumed by their cattle.  The cost was charged against their credit balances, which equaled the end-of-year payments less monthly charges.

Petitioners did not secure any volume discounts or preferential treatment from Heber or McCabe because of the large end-of-year payments.  Nor were they required to pay for feed in advance of consumption.  Customers of Heber and McCabe could pay monthly for the cost of feed consumed by their cattle and many of them did so.  Petitioners were charged for feed consumed at the same price as were all other customers independent of their feeding arrangement.  Petitioners received no price advantage by making end-of-year payments during the years in issue.

The price charged for feed by both Heber and McCabe included the cost of extensive and valuable services rendered by the cattle-feeding companies.

---

[1] An additional $9.49 was charged against Tim's payments as the fee for a branding inspection.

The end-of-year payments made by petitioners to Heber and McCabe did not secure for them specific quantities or types of feed. Nor did they secure for petitioners any business advantage other than a tax saving.

In his income tax returns Tim claimed the end-of-year payments as ordinary and necessary business expenses in the years of payment, as shown in the following schedule:

|  | 1959 | 1960 | 1961 |
|---|---|---|---|
| Cattle sales | | $67,575.24 | $118,135.46 |
| Less: Cost of cattle sold | | (30,710.41) | (64,705.14) |
| Gross profit | | 36,864.83 | 53,430.32 |
| Less: All expenses (except feed) | ($4,176.83) | (4,800.90) | (7,114.16) |
| Profit (loss) before feed expense claimed | (4,176.83) | 32,063.93 | 46,316.16 |
| Feed expense claimed | (25,000.00) | (50,522.39) | (53,000.00) |
| Net loss claimed | (29,176.83) | (18,458.46) | (6,683.84) |

The net profit computed on the basis of actual feed costs is as follows:

|  | 1959 | 1960 | 1961 |
|---|---|---|---|
| Cattle sales | | $67,575.24 | $118,135.46 |
| Less: Cost of cattle sold | | (30,710.41) | (64,705.14) |
| Gross profit | | 36,864.83 | 53,430.32 |
| Less: All expenses (except feed) | ($4,176.83) | (4,800.90) | (7,114.16) |
| Profit (loss) before feed expense | (4,176.83) | 32,063.93 | 46,316.16 |
| Feed expense (feed actually consumed) | (657.65) | (35,949.33) | (23,118.85) |
| Net profit (loss) | (4,834.48) | (3,885.40) | 23,197.31 |

In his notices of deficiencies the respondent disallowed such payments as deductions in the years paid but allowed them in the years the feed and services were supplied.

The end-of-year payments made by petitioners to Heber and McCabe were deposits for the purchase of feed and related services to be supplied in subsequent years.

### OPINION

The parties are in agreement that petitioners are engaged in the business of raising cattle for profit and are therefore entitled to deduct the cost of feed as an ordinary and necessary business expense under the provisions of section 162(a)[2] of the Internal Revenue Code of 1954. The controversy here pertains only to the year in which petitioners should be allowed to deduct payments made for feed and services.

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

As cash basis taxpayers, the petitioners claimed the payments made to Heber and McCabe as ordinary and necessary business expenses in the years of payment. They argue that the following facts fully support their position: (1) They were under a binding contractual obligation to prepay the costs of "feed," which of course included other valuable services rendered by the cattle-feeding companies; (2) the liability was fixed; (3) the amount was ascertained and certain; (4) the buyers and sellers of the "feed" recorded the transactions on their books of account as a present purchase and sale, and not as a deposit; (5) there was a good business purpose for using the prepayment method; (6) no possibility of a refund of amounts paid by petitioners was contemplated at the time payments were made; and (7) by establishing a consistent pattern of purchasing and paying for feed and services near the end of each year the petitioners have negated any tax-avoidance motive and have not materially distorted their income.

Respondent disallowed the end-of-year payments as deductions in the years paid except for small amounts applicable to the feed actually consumed in the years of payment. However, respondent has allowed deductions in the years the feed was consumed and the feeding services rendered. He contends that these payments were, in substance, advance payments or deposits which were not ordinary and necessary business expenses in the years of payment; that they served to distort petitioners' income materially; and that they created assets having a useful life beyond the year of payment which requires them to be allocated over the period to which they relate in order to reflect clearly petitioners' income for Federal tax purposes.

These cases were tried against the backdrop of three decisions involving a business deduction claimed in the year of payment for feed to be consumed in the future. They are *Cravens* v. *Commissioner*, 272 F. 2d 895 (C.A. 10, 1959), reversing 30 T.C. 903 (1958); *John Ernst*, 32 T.C. 181 (1959); and *Shippy* v. *United States*, 308 F. 2d 743 (C.A. 8, 1962), affirming 199 F. Supp. 842 (W.D. S.Dak. 1961).

The first case, *Cravens*, dealt with a taxpayer who operated a cattle ranch. In 1953, because of a drought and an impending shortage of cattlefeed, the taxpayer gave his feed supplier $50,000 as an advance payment on 745 tons of feed. Delivery was to be made as the taxpayer placed his orders, and the price was to be the market price prevailing on the delivery dates. If the advance payment exceeded the ultimate cost, the taxpayer was entitled to a refund. The feed supplier was unable to guarantee delivery, but did agree to fill the taxpayer's orders first in the event of shortages. The taxpayer claimed a deduction of the $50,000 for the year 1953, which the Commissioner disallowed. This Court sustained the disallowance on the ground

that the amount had not been "paid or incurred" in 1953, and that it was only a deposit for which deductions should have been taken as the feed was actually delivered. In upholding the Commissioner, we stated (30 T.C. at 908):

At the end of 1953, Cravens had an asset as the result of this contract, not a deductible expense. Any expense that would arise would come about upon delivery by Superior of feed which Cravens might order. Until the legal obligation to pay for the feed arose, which would occur only upon delivery on Cravens's demand, no deductible expense was incurred. *Bauer Bros. Co., supra.*

We now turn our attention to the question of whether any amount was "paid" to Superior in 1953 which would entitle Cravens to a deduction under section 23(a)(1)(A). We think it is clear that the "payment" required as a basis for a deduction has not been accomplished where there is merely a deposit as security for payment. See *Arthur T. Galt*, 31 B.T.A. 930 (1934); *Field v. Blacklidge*, an unreported case (D.C. Ill., 1940; 27 A.F.T.R. 1073, 40-2, U.S.T.C. 9499). Since we have found that the money given to Superior by Cravens was a deposit, it follows that nothing was "paid" in 1953 which would result in an allowable deduction. See *Rose v. United States*, 256 F. 2d 223 (C.A. 3, 1958).

Upon the facts, it is our view that at the end of the year 1953 petitioner was, at most, a party to a contingent contract of sale in which the price, the time of delivery, and to some extent, at least, the type of merchandise to be purchased, remained to be determined. See 1 Williston, Sales secs. 1, 2 (1948); *Ogle v. Oklahoma City Horse & Mule Commission Co.*, 173 Okla. 34, 47 P. 2d 130 (1935); *Veenstra & DeHaan Coal Co.*, 11 T.C. 964 (1948).

The Court of Appeals for the Tenth Circuit reversed our decision in *Cravens* and held that prepayment for feed to assure preferential delivery and to avoid a distress sale was reasonable and had a direct relation to the taxpayer's business; that the fact that the expenditure covered feed for more than a 12-month period did not convert it into a capital expenditure; and that the possibility of a refund did not make the amount a deposit since the contract was binding and was carried out by the parties. The views of the Court of Appeals are set forth in the following excerpts from its opinion (272 F. 2d at 899, 900–901):

There is no intimation that Cravens' decision to buy feed rather than sell his stock was an unusual decision for a cattle raiser to make in like circumstances. While the drought may have been out of the ordinary, the avoidance of a distress sale by prepayment for feed to assure preferential delivery is reasonable and has a direct relation to the taxpayer's business. By paying the $50,000 to Superior in advance, Cravens secured an advantage which, so far as the record shows, was not otherwise obtainable. When a commodity, such as cattle feed, is in short supply, an assurance of preferential delivery is important to a man who needs that commodity to stay in business.[13]

\*   .        \*        \*        \*        \*        \*        \*

In the case of farmers and cattle raisers the use of a transactional basis for the computation of income would bring confusion into the federal tax system. The treatment of the cost of seed, fertilizer, and feed purchased in one year for use in the next year is simple if the deduction is allowed when paid if the cash basis applies or when incurred if the accrual basis is used.[20] If each transaction must be analyzed to determine whether a distortion of income will result

from the allowance of a business expense deduction, § 43 is, in our opinion, given a meaning which Congress did not intend.
   [Footnotes omitted.]

In *Ernst*, the taxpayer, a poultry farmer, made substantial payments in December of 1948 and 1949 to a graindealer who became obligated to deliver quantities of chickenfeed to the taxpayer during the succeeding years. The payments were for the purchase of a certain number of cars of feed and bags of scratch, the price of which was to be adjusted at the date of shipment. Deliveries were actually made by the graindealer in the early months of 1949 and 1950. Ernst had no need for the quantities of chickenfeed he paid for in 1948 and 1949. The graindealer credited payments made by the taxpayer to his account receivable card and charges were made at the time of deliveries. The charges were determined by the quantity of the deliveries and the prevailing price on the weekly wholesale pricelist at that time. Neither a sale nor sales income was taken into account on the books of the graindealer until the feed was delivered. The taxpayer had no right to a return of any of the payments made. On these facts we held that the amounts given to the graindealer were deductible in the years of payment.

In distinguishing *Cravens*, we said that (32 T.C. at 185–186)—

the payments for feed disallowed by respondent were not in the nature of deposits to be reimbursed to petitioner if he decided not to order delivery of the feed or if the grain dealer would not or could not make such delivery. The payments were absolute and petitioner, who reported his income on a cash receipts and disbursements basis, was irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident to "carrying on a trade or business." In return for these payments, the grain dealer was unconditionally obligated to deliver to petitioner the quantity of feed which the amounts received would pay for at the prices in effect on the dates of delivery. There was no condition as to the obligation itself; the only condition was as to the *quantum* of the obligation. Similar payments for feed to be used in the spring months of the following year were made by petitioner in December of all years subsequent to the taxable years.[1] This practice does not substantiate the statements of counsel for respondent that "[t]hese transactions have no commercial meaning or sense other than as a tax dodge" and "that to allow such deductions would materially distort petitioner's income." * * * [Footnote omitted.]

In *Shippy*, the taxpayers were members of a partnership engaged in a cattle- and hog-feeding business. Income was reported on a cash basis. On December 28, 1957, the partnership made a $23,000 payment to a grain elevator operator for feed to be delivered in the future as needed by the partnership in its feeding operations. Feed was supplied to the partnership from time to time in 1958 at the price in effect on the date of each delivery until the entire $23,000 was exhausted in July of that year. The District Court held that the payment was not an ordinary and necessary business expense in 1957, the year of pay-

ment, because, as an advance deposit to cover future purchases of grain, its deduction in that year would materially distort true income and the asset created by the payment extended beyond the close of the taxable year 1957. In so holding, the District Court stated (199 F. Supp. at 843):

The record shows that this $23,000.00 deposit was the largest single payment for feed ever made by the Shippy partnership—almost triple the amount of any previous single payment. It is further noted that on all previous occasions, the partnership had paid for feed on or after delivery—never in advance. Hence, this large advance deposit for future delivery of feed could hardly be termed "ordinary." Neither was it "necessary." The reasons advanced by the partnership as to the necessity of the advance deposit are not convincing. There was no shortage of feed. Advance payment was not and never had been demanded by the elevator. The elevator's commission paid by the partnership was the same as it had always paid, and the advance deposit assured it of no preferential treatment it could not have had without such deposit.

The arrangement made between the partnership and the elevator was not a contract. It was an advance deposit for future purchases of feed. We do not believe that Congress intended that taxpayers should be allowed to "juggle" their tax liability in this manner.

This decision was affirmed by the Court of Appeals for the Eighth Circuit which concluded that (308 F. 2d at 747–748) —

the partnership did not have a binding contract to purchase wet corn or other grain. It did not actually buy grain. It made only an advance deposit which would have been refunded upon request. Therefore, the disbursement was not an ordinary and necessary expense paid in the year 1957 in the carrying on of its trade or business.

While the *Cravens*, *Ernst*, and *Shippy* cases appear to be factually similar to the instant case, we think each is distinguishable. Unlike *Cravens*, where the taxpayer had a compelling business reason for the large end-of-year payment for feed, these petitioners had no genuine business reason for making advance payments other than the creation of a tax saving. There was no shortage of feed and the payments secured no preferential treatment for them. Although petitioners testified that their only reason for making the end-of-year payments was to fix the price of feed at the market price on the date of payment, the evidence clearly shows that they did not achieve this purpose. They were charged the current market price, not a predetermined price, when the feed was consumed, and this cost was charged against their credit balances at the cattle-feeding companies. Moreover, while Cravens never received a refund, these petitioners did in essence receive what amounted to substantial refunds in 1961. And, finally, the petitioners' cost of "feed" included valuable and significant services rendered by both of the cattle-feeding companies. That portion of the cost was nothing more than a deposit for the payment of services to be supplied in the future. Such an amount is deductible only when the services are performed.

The facts which distinguish this case from *Ernst* are: (1) Petitioners actually received in 1961 what we regard as a refund for feed not consumed; and (2) the price of "feed" here included the cost of valuable services to be rendered in the future. Notwithstanding petitioners' heavy reliance on *Ernst* and on the Tenth Circuit's opinion in *Cravens*, we lack the pioneering spirit to extend the frontier of the factual conclusions reached in those decisions to cover the different facts before us in these cases. Suffice it to say that neither *Ernst* nor *Cravens* is controlling here.

We believe these facts present a stronger case than *Shippy*, except for the specific finding in that case that the seller considered the payment a deposit. Again we emphasize the inclusion of services in the cost of feed to be consumed by petitioners' cattle in the future and the sizable refunds received by both petitioners from McCabe in 1961.

Since we have found that the amounts placed in the hands of the cattle-feeding companies near the end of each year in question were merely deposits, it follows that they cannot be treated as *expenses* deductible in such years. When transferred to the companies, the amounts did not constitute expenditures for feed and services. It is our view that the Commissioner's determination was correct in allowing the amounts as ordinary and necessary business expenses only in the years of their use in defraying the cost of feed and other services. *Shippy* v. *United States*, *supra*. We hold for the respondent on this issue. It therefore becomes unnecessary for us to consider respondent's alternative contention that the allowance of such amounts in the years paid would materially distort petitioners' income under sections 446 and 461.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

