Gold-Pak Meat Co., Inc., and Bristol Meat Co., Inc. v. Commissioner.
Gold-Pak Meat Co. v. Commissioner
Docket No. 4996-68.
United States Tax Court
T.C. Memo 1971-83; 1971 Tax Ct. Memo LEXIS 246; 30 T.C.M. (CCH) 337; T.C.M. (RIA) 71083; April 26, 1971, Filed. Helen A. Buckley, Suite 500 Gateway East Bldg., Century City, Los Angeles, Calif., for the petitioners. Paul G. Wilson, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the income tax of petitioner Gold-Pak Meat Co., Inc., for its taxable period August 7, 1963 to May 1, 1964, in the amount of $3,779.89 and in the consolidated income tax of petitioners Gold-Pak Meat Co. and Bristol Meat Co. for their taxable years ended April 30, 1965 and April 29, 1966, in the respective amounts of $208,083.97 and $44,462.05. Some of the issues raised by the pleadings have been conceded by the parties, leaving for our decision the following: (1) Whether petitioners, as affiliated corporations, are entitled to use different methods of accounting in filing a consolidated return. [1]
*248 (2) Whether advances made by either or both petitioners to feedlots are deductible expenses in the year paid. (3) Whether the additions made to the reserve for bad debts by petitioner Gold-Pak Co., Inc., were reasonable. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Gold-Pak Meat Co., Inc. (hereinafter referred to as Gold-Pak) and Bristol Meat Co., Inc. (hereinafter referred to as Bristol), are corporations organized on August 7, 1963, and September 15, 1964, respectively, under the laws of California, whose principal offices are and were at the time of the filing of the petition in this case in Los Angeles, California. Gold-Pak owns 100 percent of the stock of Bristol. Gold-Pak reporting its income on an accrual basis of accounting filed with the district director of internal revenue at Los Angeles, California, a United States corporation income tax return for its taxable period August 7, 1963 to May 1, 1964. Gold-Pak and its affiliate, Bristol, filed with the district director of internal revenue at Los Angeles, California, a consolidated United States corporation income tax return for each of their taxable years ending *249 April 30, 1965 and April 29, 1966. Bristol kept its books and records on a cash receipts method of accounting for its fiscal period ended April 30, 1965, and its fiscal year ended April 29, 1966, and Gold-Pak continued to use an accrual method for its fiscal years ended April 30, 1965 and April 29, 1966. Both companies elected to file consolidated returns for these fiscal years and in the returns filed used the different methods of accounting on which their books were kept. Neither Bristol nor Gold-Pak requested consent of the Commissioner to file consolidated returns using different methods of accounting for these periods. Gold-Pak is in the business of buying, slaughtering, processing, and selling beef and other cattle products. It purchases live cattle, primarily from feedlots located in California and Arizona. Gold-Pak generally purchased its cattle ready for slaughter but did at times purchase animals which had not reached a desirable weight for slaughter and placed them on feedlots to be fattened until they reached an approximate weight of 1,000 pounds. Bristol since the time of its organization on September 15, 1964, has been engaged is the business of buying, feeding, *250 and selling cattle. Bristol would generally buy "feeder" cattle weighing approximately 650 pounds and place them on feedlots for approximately 150 days until the cattle reached the approximate weight of 1,000 pounds. Bristol also at times purchased calves which would be grazed or fed alfalfa until reaching the "feeder" weight when they would be placed on a feedlot. Bristol sold substantially all of its cattle to Gold-Pak. However, Bristol was not a major supplier for Gold-Pak. Gold-Pak made payments to Bristol in 339 the same manner as it made payments to its other suppliers, that is, on a weekly basis. At the end of its fiscal years 1965 and 1966 Bristol had accounts receivable due it from Gold-Pak for cattle delivered before the end of the year in the amounts of $30,500.50 and $22,041.10, respectively. Under Gold-Pak's accrual basis of accounting these amounts were properly includable in its cost of goods purchased. Bristol on its cash basis of accounting did not include these amounts in its income. Both petitioners entered into contracts with the feedlots either on the basis of a fixed cost per pound of weight gained, or on a maximum price per pound of feed used. Some of the *251 contracts were written and others were mere oral agreements or understandings. While the cattle were on the feedlots employees of both petitioners visited the pens regularly to insure that the cattle were being properly fed and finished for market or, in the case of Gold-Park, for slaughter. The employees also checked the physical condition of the cattle, and the amount of weight gained. Based on estimated weight gained or amount of feed consumed interim billings were submitted to petitioners by the feedlot operators and payments were made to these operators on a weekly basis. Toward the end of petitioners' 1965 fiscal year each of them made advance payments to feedlot operators without any bill having been rendered to them by such operators. During its fiscal year ended April 30, 1965, Gold-Pak made payments totaling $51,000 to Butterworth Land and Cattle Co. (hereinafter referred to as Butterworth) for feed and care of cattle owned by Gold-Pak, which feed and care was furnished by that company in the following fiscal year. Gold-Pak's contract with Butterworth did not require these payments and the payments were with respect to all cattle under care of the feedlot operation at *252 the time. No bill for the advance payment had been submitted. Gold-Pak's contract with Butterworth was on a fixed price per pound of weight gained basis. In April of 1965, Bristol made payments totaling $316,000 to four feedlots for feed and care of its cattle. During the month of April 1965 feeding and care of cattle was furnished in an amount totaling $71,628.49. The balance, $244,971.51, represented feed and care of cattle furnished in the subsequent fiscal year. Included in the $316,000 was an amount of $75,000 paid by Bristol for 1,250 tons of feed at $60 per ton in order to obtain a guarantee that the price of the feed fed to the cattle would not exceed this sum. This amount was in no event refundable. None of the other agreements with respect to which Bristol made advance payments contained a similar provision. Gold-Pak, as a new entry into the meat processing field, sold to individual accounts, normally meat jobbers in the restaurant supply business, rather than to chain stores. Since the customers of meat jobbers usually are restaurant operators, jobbers are more likely to experience large losses than are stores which sell to individual customers for cash. Gold-Pak normally *253 sold to its customers on a weekly or biweekly cash basis, rarely extending credit beyond a 2-week period. In 1967 one of Gold-Pak's jobber customers became bankrupt and Gold-Pak suffered a loss of approximately $77,000 representing 2 to 3 weeks' sales to the account. It was not unusual for Gold-Pak to have such a volume of sales to one customer during a 2 to 3-week period. In its initial year of operation Gold-Pak set up a reserve for bad debts and for that year placed $31,812.66 in this reserve. It increased its reserve for bad debts in the amounts of $17,728.91, and $30,450.71, respectively for the years ended April 30, 1965, and April 29, 1966. The amounts to be added to the reserve were determined by Gold-Pak's president with the advice of its certified public accountant. The major portion of this accountant's practice was for clients in the meat packing business. In arriving at the amounts to be added to the bad debt reserve Gold-Pak's president and accountant took into consideration the fact that the company was a new company, that its sales were primarily to jobbers and the experience of other companies about which they had information. Gold-Pak charged its reserve for bad *254 debts $1,124.30 for the period May 2, 1964 to April 30, 1965, and $2,267.69 for the period May 1, 1965, to April 29, 1966 for bad debts actually incurred. For the fiscal year 1967 the reserve was charged with bad debts incurred of $77,024.07. The internal revenue agent who investigated petitioners' tax liability for the years here in issue determined on the basis of the experience of a company named Gold Ring Company that proper additions to Gold-Pak's bad debt reserve for its fiscal 340 years 1964, 1965, and 1966 were $24,628.31, $0, and $10,945.91, respectively. At the time he computed Gold-Pak's bad debt reserve in this manner the agent was of the opinion that Gold-Pak was a successor to the business of Gold Ring Company. Although Gold-Pak utilized part of the space formerly leased by Gold Ring Company and sold to certain customers which had previously dealt with Gold Ring, there is no ownership connection between the two companies and Gold-Pak did not take over the operations or business of Gold Ring. Gold-Pak secured its own customers including some of those who had previously bought beef from Gold Ring. Gold Ring ceased its meat processing business at the time it vacated *255 the premises which Gold-Pak leased. It had been a diversified meat processor dealing in beef, sheep, and occasionally hogs. Gold Ring also engaged in smoking operations of bacon and hams. Gold-Pak was a slaughterer and processor of beef only. The president and shareholder of Gold-Pak had been an employee of Gold Ring as manager of its beef processing operations, but neither he nor any of his family had ever owned an interest in Gold Ring. Gold-Pak's sales were $10,575,317.19, $27,796,825.97, and $26,677,889.14 for its fiscal years 1964, 1965, and 1966, respectively. Its accounts receivable at the end of these fiscal years were $1,132,996.75, $433,867.11, and $1,001,325.31, respectively. Respondent in his notice of deficiency disallowed the deduction of the $51,000 prepaid feed expense claimed by Gold-Pak in its fiscal year 1965 with the explanation that since the amount was unexpended by the feedlot at the end of the taxable year it constituted a deposit or advance and not an accrued expense of Gold-Pak. Respondent in his notice of deficiency disallowed the amount of $7,184.35, $17,728.91, and $19,504.80 of additions to bad debt reserve made by Gold-Pak for its fiscal years 1964, *256 1965, and 1966, respectively, with the explanation that such additions were not reasonable. Respondent in his deficiency notice also determined that petitioner Bristol should report its income in the consolidated return on an accrual method of accounting with the explanation that the cash method used differed from the accrual method used by Gold-Pak and the inconsistent methods did not clearly reflect the consolidated taxable income. Accordingly, respondent made the following adjustments to the income of Bristol: 5-2-64 to4-30-65
5-2-65 to4-29-66
Unrecorded sales
$ 30,502.54
$ 22,041.10
Cost of sales, cattle
(64,598.21)
(42,002.96)
Cattle feed expense capitalized and ending inventory increased
* 385,890.35
495,380.81
Net increase to inventory
$351,794.68
$475,418.95
*257 For the same reason that he increased Bristol's income in each year by increasing ending inventory, respondent, for its fiscal year 1966, decreased Bristol's income by $351,794.68 of increase to its opening inventory. Opinion Section 1501, I.R.C. 1954, [2] grants to affiliated corporations the privilege of filing consolidated returns, conditioned on each member of the group consenting to all the consolidated return regulations prescribed under section 1502. Section 1502 authorizes the promulgation of regulations dealing with consolidated returns, and pursuant to that authority, section 1.1502-44A, Income Tax Regs., was promulgated. Section 1.1502-44A(a) provides that all members of the affiliated group shall adopt the method of accounting which clearly reflects the consolidated income. Section 1.1502-44A(b) provides an exception under certain conditions to this requirement for a uniform method of accounting where members of an affiliated group have established 341 different methods of accounting. In such a case, the regulations provide that: * * * each member may retain such method with the consent of the Commissioner: Provided, That the consolidated *258 taxable income is clearly reflected: And provided further, That intercompany transactions affecting such consolidated taxable income shall be eliminated and adjustments on account of such transactions shall be made with reference to a uniform method of accounting to be selected by the members of the group with the consent of the Commissioner. It is clear that petitioners have not complied with the last requirement of the regulations in that they have not eliminated the intercompany transactions affecting the consolidated income and made adjustments under a uniform method of accounting. In fact, the purchase of cattle by petitioner Gold-Pak from petitioner Bristol is treated as an accrued expense like any other purchase, but is treated as income by Bristol only upon receipt which occurs as much as 3 to 5 days later. This certainly has an effect upon taxable income near the end of the consolidated fiscal year. For this reason only, the taxable income of the consolidated group is not clearly reflected. In our view, the consolidated income is also improperly reflected with Bristol on a cash basis and Gold-Pak on an accrual *259 basis, particularly in the fiscal year 1965, because of the relatively high inventory of cattle held by Bristol at the end of that year as compared to the short period in which it had made sales of cattle. Also, it is clear that the consent of the Commissioner was not obtained by petitioners to report consolidated income on different methods of accounting. Petitioners' primary position in this case is that section 1.1502-44A of the regulations is invalid in that it is not within the intent of Congress. Petitioners in this respect argue that as applied to a farmer this regulation violates the Congressional intent to allow a farmer to elect a cash basis of accounting. Where, as here, the Code specifically authorizes the promulgation of regulations, the regulations issued pursuant to that authority take on legislative character. Such being the case, it is incumbent upon the Court to refrain from overruling such regulations unless they are clearly shown to be contrary to the will and intent of Congress. Commissioner v. South Texas Lumber Co., 333 U.S. 496 (1948) and Regal, Inc. *260 53 T.C. 261 (1969), affirmed per curiam 435 F. 2d 922 (C.A. 2, 1970). We see nothing in these regulations which would stand so clearly opposed to Congressional will. As we pointed out in Regal, Inc., supra, at 266: Congress was obviously concerned with potential abuses [of consolidated filing] and the possibility that income might not be clearly reflected through the use of consolidated returns, and it sought to meet the overall problem by giving the Commissioner comprehensive authority to deal with the matter in all its aspects through regulations. It is obvious that the use of different accounting methods by separate members of an affiliated group filing a consolidated return might result in distortions of income by, among other things, allowing the lumping of income or deductions through selective use of accrual or cash payment. In our view the Commissioner's method of dealing with this potential problem as evidenced by section 1.1502-44A of the regulations is not contrary to the Congressional intent but rather is clearly in conformance therewith. Petitioners point out and respondent concedes that Bristol is a farmer within the meaning of *261 section 1.162-12, Income Tax Regs., which allows a farmer to expense the cost of all feed purchases and other costs represented by an actual outlay. Petitioners also point out that farmers are specifically granted an option to report their income on the cash receipts or inventory method of accounting under section 1.471-6, Income Tax Regs. Petitioners argue that the practical effect of the consolidated return regulations relied upon by respondent in this case would be to preclude Bristol from exercising its option to report on a cash receipts basis, and would also mean that Bristol would not be able to deduct the cost of farming operations represented by actual outlay as allowed in sections 1.471-6 and 1.162-12, Income Tax Regs.
While section 1.162-12 does permit a farmer to expense cost of feed and other costs connected with raising livestock, if the farmer is on an accrual basis of accounting so much of the expense as is applicable to his livestock in inventory must be included in the value of his inventory unless he selects some other method of valuing inventory. Petitioners have made no contention or objection to the specific 342 adjustments made by respondent in placing Bristol *262 on an accrual basis of accounting if Bristol is required to report on that basis. Therefore, petitioners' argument under section 1.162-12, Income Tax Regs., does not differ from their argument based on section 1.471-6 of those regulations. Petitioners' argument appears to be that by requiring Bristol to conform its method of accounting to that used by Gold-Pak respondent is depriving it of the right conferred upon it by section 1.471-6 of selecting the option as a farmer to report its income on the cash method of accounting. As was stated in United States v. Transamerica Corporation, 345 F. 2d 765 (C.A. 9, 1965), the regulations do not make the option for the taxpayer but merely limit his choice. If a farmer desires to exercise its options freely within section 1.471-6, then it must refrain from filing a consolidated return. By choosing to file a consolidated return the farmer is not precluded from its options under section 1.471-6, but must collaborate with the other affiliates in selecting one alternative or the other. The choice of options is still available, if both parties qualify. If they do not, then the farmer made its choice by electing to become part of the affiliated *263 group filing a consolidated return. Petitioners have asserted that both Gold-Pak and Bristol are farmers within the meaning of the Internal Revenue Code and section 1.162-12, Income Tax Regs. Respondent has conceded that Bristol is a farmer, but contends that Gold-Pak does not qualify as a farmer, but is at most a cattle warehouseman, or its equivalent. Petitioners raise the issue in an apparent attempt to justify the use of two different accounting methods in a consolidated return, by asserting that Bristol, as a farmer used the cash method as allowed, and Gold-Pak used the same cash method for its farming operations and therefore there was only one method being used within the meaning of section 1.1502-44A of the regulations. We do not subscribe to this view. Petitioners state: Taxpayers, as livestock raisers, have properly elected to make their return on the cash receipts and disbursements method of accounting so as to report all income and expenses in a consistent manner without distortion of income. However, the stipulation and other evidence clearly show that Gold-Pak kept its books and records and reported its income on an accrual method, not the cash receipts and disbursements *264 method. Petitioners may be arguing that Gold-Pak kept its records and reported income on a cash method with regard to its livestock, that is farming operations. The evidence does not support this contention. The certified public accountant who supervised the keeping of Gold-Pak's books testified that Gold-Pak reported its income on an accrual basis. He stated that Gold-Pak's cattle were valued on the basis of their initial cost but that all other items were on an accrual basis. This evidence does not support petitioners' contention that Gold-Pak's livestock operations were on a cash basis of accounting but rather supports the conclusion that these operations were primarily on an accrual basis. Furthermore, the evidence in the record indicates that it would be improper for Gold-Pak to report its livestock operations on a cash basis and its other operations on an accrual basis. Section 1.446-1(d), Income Tax Regs., provides for use of different bases of accounting where one taxpayer operates two separate and distinct trades or businesses. [3] Gold-Pak's cattle feeding operations were not separate and distinct from its meat processing operations. The cattle Gold-Pak fed on its own account *265 were ultimately destined for its own slaughtering operations, and therefore were most intimately connected with those operations. The cattle feeding operation of Gold-Pak was not treated as a separate division, with separate books of account, employees, and other accouterments of a business enterprise. Rather Gold-Pak 343 completely intergrated the bookkeeping, personnel, and other incidents of business of both its meat processing and cattle feeding operations. The accountant who kept Gold-Pak's books clearly indicated that the transfer of the cattle from the feeding operation to the slaughtering operation was accomplished by adding to the cost of sales the inventory cost of the cattle. The close interrelationship between Gold-Pak's cattle feeding operation and the meat processing $ 7:
akes section 1.446-1(d) inapplicable.
*266 The consolidated returns filed by petitioners fail to meet the requirements of section 1.1502-44A, Income Tax Regs., and we therefore sustain respondent in his computation of the consolidated income by computing Bristol's income on an accrual basis. Petitioner Gold-Pak added to its reserves for bad debts the sums of $31,812.66, $17,728.91, and $30,450.71 for the respective years ended May 1, 1964, April 30, 1965, and April 29, 1966. Respondent argues that the additions in question were unreasonably high and should be limited to $24,628.31, 0, and $10,945.91, respectively. Petitioners, of course, argue that the entire addition was in each instance reasonable and allowable. Section 166(c) allows a deduction in the discretion of the Commissioner for reasonable additions to a reserve set up for bad debts. [4] Respondent has not questioned Gold-Pak's selection of the reserve method of reporting bad debts but merely the amount of its additions to the reserve. Section 1.166-4(b), Income Tax Regs., [5] provides that the reasonableness of the addition shall be determined in the light of the facts existing at the close of the taxable year, that it will vary between classes of taxpayers and *267 will depend primarily upon the total amount of outstanding debt at the end of the year. The cases are clear that petitioners must prove not only that Gold-Pak's addition to the reserve is reasonable but that respondent's disallowance of the additions in the years here in issue was arbitrary and an abuse of discretion. Roanoke Vending Exchange, Inc., 40 T.C. 735, 741 (1963). The cases are likewise clear that the ultimate question is the adequacy of the reserve at the end of the year to meet reasonably anticipated bad debts. Roanoke Vending Exchange, Inc., supra.
*268 It is apparent from the record that respondent based his determination as to the reasonableness of the respective additions to Gold-Pak's reserve for bad debts upon an arithmetical formula computed by the agent who investigated petitioners' tax liability for the years here in issue, utilizing the experience of Gold Ring Company, a firm in the business of slaughtering and processing general meat, including pork, lamb, and beef. The record indicates that respondent's agent chose Gold Ring as his experience indicator on the mistaken assumption that Gold Ring was Gold-Pak's predecessor corporation. However, this was not the fact. There was no direct relationship between the two companies and little indirect relationship. Gold-Pak sold to some customers to whom Gold Ring had sold and the chief officer of Gold-Pak had been an employee of Gold Ring. However, Gold Ring had an established business whereas Gold-Pak had newly entered into business and found it necessary to sell to high risk accounts. Also, Gold Ring had customers for products not produced by Gold-Pak. On the whole Gold-Pak's customer make-up was substantially dissimilar to that of Gold Ring. We agree with petitioners that a *269 comparison of Gold-Pak with Gold Ring is erroneous. Such a comparison fails to give consideration to the fact that Gold-Pak had recently entered into a competitive market and had to adopt credit policies which would build up its volume and attract customers. See Winter Garden Production Credit Ass'n v. Phinney, 139 F. Supp. 213 (S.D.Tex., 1955). The amount of Gold-Pak's additions to its reserve was determined by consultations between Gold-Pak's president and an independent certified public accountant, both 344 of whom were experienced in the industry. While this would not in itself be sufficient to show that the amount so determined was proper, Imperial Type Metal Co. v. Commissioner, 106 F. 2d 302 (C.A. 3, 1939), affirming a Memorandum Opinion of this Court, it is entitled to some weight in determining the reasonableness of the amount as viewed prospectively. The evidence indicates that Gold-Pak was in the habit of giving no more than 2 to 3 weeks credit to its customers, which in itself demonstrates a concern for the financial responsibility of its accounts in general. However, because of the type of customers to whom it sold, it was not unlikely *270 that the sum of credit extended to any one customer for this short period would be substantial, in some instances reaching the $50,000 to $75,000 range. Finally, Gold-Pak did sustain a large loss in 1967. Although the losses in later years cannot be considered as dispositive, for the additions must be viewed as reasonable or unreasonable at the time made rather than from hindsight, nevertheless, such losses can act as corroboration of the validity of petitioners' estimates in the year in question. Albert C. Becken, Jr., 5 T.C. 498, 506 (1945), and Apex Brewing Co., 40 B.T.A. 1110, 1119-1120 (1939). Respondent's determination was based on an erroneous assumption made by his agent. In our view when this fact is considered in the light of the other evidence in the record, petitioners have sustained their burden of showing that respondent's disallowance of the additions to Gold-Pak's reserve for bad debts was arbitrary and an abuse of discretion. From the evidence as a whole we find that Gold-Pak's estimates were reasonable and valid and therefore sustain petitioners on this issue. Petitioners finally assert that Gold-Pak is entitled to deduct in the year *271 of payment the $51,000 paid to a feedlot for feed and care of its cattle during the following year. [6]
Petitioners rely on Cravens v. Commissioner, 272 F. 2d 895 (C.A. 10, 1959), reversing 30 T.C. 903 (1958), in which the Court of Appeals held that a rancher who prepaid feed expenses for the following year to get preferential treatment on delivery during a period of drought could deduct those expenses as ordinary and necessary business expenses in the year of payment. The taxpayer in that case was on the cash receipts and disbursements method of accounting, and the issue was whether the expenditure was an ordinary and necessary business expense or a capital expenditure. In Tim W. Lillie, 45 T.C. 54 (1965), affirmed per curiam 370 F. 2d 562 (C.A. 9, 1966), this Court held that a dentist in the cattle feeding business could not deduct in the year of payment year-end expenditures for feed to be consumed and services to be rendered by a lot operator in the following year. We stated that there *272 was no business reason, such as existed in Cravens, for making such a prepayment, and further that the receipt of a refund in a subsequent year, though not contemplated at the time of payment, showed the expenditure to be a mere deposit for the payment of feed and services to be supplied in the future. In John Ernst, 32 T.C. 181 (1959), a poultry farmer made year-end payments to a grain dealer for chicken feed to be delivered in the following year. In that case there existed no right of repayment. The evidence showed that for a number of years the taxpayer had made such year-end payments to insure delivery in the following year of the specific types and kinds of feed he would need in his chicken raising business. The taxpayer was charged the prevailing price at the time of delivery. We held that the payments were not deposits and allowed the deduction in the year of payment. In both Cravens v. Commissioner, supra, and John Ernst, supra, there existed a valid business purpose for making the payments in advance and in John Ernst there existed no right of repayment. Gold-Pak's contract with the feedlot to which it made the $51,000 prepayment *273 was on a fixed price per pound of weight gained basis. Therefore, Gold-Pak secured no price advantage by the payment. Gold-Pak attempted to tie the prepayment to its desire to insure price stabilization, but there is nothing in the evidence to support this contention. Also, the reasonable indication from the record is that if the $51,000 were not required to cover the care of the cattle in 345 the following year, it would be refunded even though there was no specific contractual arrangement regarding reimbursement if the full advance payment were not consumed. Also, the payment here, as in Tim W. Lillie, supra, was for feed and services to be provided by the feedlots in the care and feeding of the cattle. The only factual difference in this case and Tim W. Lillie, supra, is that here Gold-Pak was on an accrual method of accounting whereas the taxpayer in Lillie was on the cash method. This factual difference does not cause the cases to be distinguishable. An amount of a prepaid deposit is not an accrued expense of an accrual basis taxpayer any more than an actual expense to a cash basis taxpayer. The expense is not incurred until the feed and services *274 for which it is to pay have been provided and the amount is due to the person providing them. We sustain respondent's disallowance of the deduction claimed by Gold-Pak in its fiscal year 1965 of the $51,000 advance payment to a feedlot. Decision will be entered under Rule 50. Footnotes
1. A similar issue is involved in Salempacking Co., a California corporation, Parent, Winston Farms, a California corporation, Subsidiary, 56 T.C. No.↩ 14, filed April 26, 1971.
*. In cluded in the above amount is $244,971.51 which represents an advance deposit to feedlots for feed and care of cattle which was unexpended by the feedlots at the end of the current flscal year. In the event it is held that Bristol Meat Co., Inc., is entitled to use the cash receipts and disbursements method of accounting, it is further determined that the amount of $244,971.51 is a deposit in advance for future expenses of feeding and caring for cattle and, as such, that amount is not deductible in the current year regardless of the method of accounting permitted.↩
2. All references are to the Internal Revenue Code of 1954.↩
3. Sec. 1.446-1(d), Income Tax Regs.
(d) Taxpayer engaged in more than one business. (1) Where a taxpayer has two or more separate and distinct trades or businesses, a different method of accounting may be used for each trade or business, provided the method used for each trade or business clearly reflects the income of that particular trade or business. For example, a taxpayer may account for the operations of a personal service business on the cash receipts and disbursements method and of a manufacturing business on an accrual method, provided such businesses are separate and distinct and the methods used for each clearly reflect income. The method first used in accounting for business income and deductions in connection with each trade or business, as evidenced in the taxpayer's income tax return in which such income or deductions are first reported, must be consistently followed thereafter.↩
4. SEC. 166. BAD DEBTS. * * * (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. ↩
5. Sec. 1.166-4, Income Tax Regs., Reserve for bad debts. * * * (b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonableonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.↩
6. Since we have sustained respondent's determination of Bristol's income on an accrual basis, we do not reach this issue as to Bristol.↩