Russell Mann and Vivian Mann v. Commissioner.
Mann v. Commissioner
Docket No. 831-70.
United States Tax Court
T.C. Memo 1972-162; 1972 Tax Ct. Memo LEXIS 98; 31 T.C.M. (CCH) 808; T.C.M. (RIA) 72162; July 31, 1972
*98 Petitioner was a farmer and a cash basis taxpayer. On December 31, 1966, he gave Hatchery a check for $20,731 for feed to be delivered in 1967. Although petitioner received a sales ticket from Hatchery indicating that he had purchased certain feeds at stated prices, petitioner was not required to accept delivery of the feeds listed on the sales ticket but could substitute other feeds as conditions warranted. In addition petitioner's account with Hatchery was to be debited with the market price of feed delivered rather than the sales ticket price. Held: Petitioner's transfer of $20,731 to Hatchery was a deposit and not an expense paid in 1966 for purposes of deduction under section 162. Held, further: Even if petitioner's transfer of $20,731 to Hatchery was not a deposit and was a payment, such payment was not an ordinary and necessary expense of petitioner's business under section 162. William V. Phelan, 201-220 Bremer Bldg., Iowa City, Iowa, for the petitioners. Roy S. Fischbeck, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined a deficiency in the income taxes of petitioner in the amount of $9,957.95 for calendar year 1966. After concessions by the parties the single issue for decision is whether petitioner is entitled to deduct under section 162 [1] the amount of $20,731 paid to afeed dealer on December 31, 1966, for feed to be delivered in the future. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners are Russell Mann and Vivian Mann, husband and wife, who at all relevant times lived *100 in Iowa City, Iowa. Vivian Mann is a petitioner by virtue of having filed a joint income tax return with her husband for 1966. Hereafter petitioner will be used to refer to Russell Mann. In 1966 petitioner was self employed as a real estate broker and farmer. Petitioner owned two improved farms known as the RVM and Mann farms. The RVM farm, near Oxford, Iowa, comprised 360 acres and was used for raising grain and cattle. The Mann farm was a 343-acre tract near Iowa City on which grain, cattle and hogs were raised. During 1966 the RVM farm operated under a partnership composed of petitioner and Joe Collins whereby petitioner furnished the land and Collins operated the farm. The partners shared the grain and jointly owned the livestock raised thereon. As part of the RVM farm operation for 1966 the partnership purchased 401 cows, 3 bulls, 18 calves, 5 horses, and sold 312 cows, 1 bull, 16 calves, 5 horses. At the end of 1966 there were on hand 85 cows and 2 bulls. During 1966 petitioner began operating a feeder pig business on the Mann farm. This farm was operated by petitioner on a cost-share basis with the actual operator thereof, Kenneth Mann, a relative of petitioner. Petitioner *101 furnished the land and paid all expenses of the farm operation whereas the operator furnished the labor and the machinery. Expenses were deducted from operating receipts and the balance equally divided. In 1966 the Mann farm operation included the purchase of 128 sows, 48 cows, 1 bull, and the sale of 1,233 feeder pigs, 35 sows, 11 steers, 9 heifers, 1 bull. At the end of 1966 there were on hand 128 sows, 4 boars, 350 pigs, 48 cows, 1 bull. Petitioner had been for many years prior to 1966 a regular customer of Keith Wilson Hatchery, Inc. (Hatchery). Hatchery's 809 principal officer and shareholder at all material times was Keith Wilson (Wilson) who had been a friend of petitioner for over 30 years. Hatchery's principal business activity was the retail sale of commercial feeds, chickens and eggs, and the buying and selling of farm grains. Among the feed products sold by Hatchery was the Ful-O-Pep line manufactured by Quaker Oats Company. This line included hog feeds distributed under the brand names of Pre-starter, Starter Bracer, Pig Grower JJ, Pig Grower Supplement JJ2 and others, all of which were retailed by Hatchery in 50-pound bags. On December 30, 1966, petitioner *102 went to Hatchery's office and talked with Wilson in regard to his feeder pig operation and hog feed requirements for the Mann farm operation for 1967. Following the discussion between petitioner and Wilson, Hatchery issued and delivered to petitioner its ticket No. 65968 dated December 30, 1966, which designated petitioner as "customer" and contained the following pertinent entries: Quantity
Description
Price
Amount
9,350 bu.
No. 2 Yellow Corn
$ 1.42
$13,277
1 ton
Pre-starter
234.00
234
10 tons
Starter Bracer
134.00
1,340
30 tons
Pig Grower JJ
108.00
3,240
15 tons
Pig Gro Supp JJ2
176.00 2,640
$20,731
Petitioner and Wilson agreed that petitioner did not have to take delivery of the exact amounts of feeds listed on the ticket and that petitioner could substitute other feeds if the condition of his hogs so required. The prices stated on the ticket did not take into account the usual discount of $5 per ton given to petitioner or Hatchery's $2 per ton hauling discount. The parties agreed that the prices charged petitioner upon delivery of the feed would be reduced by these discounts. The prices stated on the ticket were purportedly *103 the maximum prices to be charged petitioner for feed delivered in 1967; however, petitioner was to be charged market price less discount if that price was lower than the ticket price less discount. On December 31, 1966, petitioner delivered to Hatchery his check payable to it in the amount of $20,731. Upon receipt thereof Hatchery issued and delivered to petitioner its ticket No. 65971 dated December 31, 1966, which designated petitioner as "Customer," contained a check mark in a square space entitled "on acct.," and further contained the following entries: Description
Amount
Corn and Feed
$20,731
No portion of the grain and feed items listed in ticket No. 65968 issued by Hatchery was delivered to or received by petitioner during the calendar year 1966. After receiving petitioner's payment Hatchery did not set aside the amounts of feed stated in the tickets or charge petitioner for storage of the feed. At trial Wilson could not recall whether Hatchery had enough feed on hand at the close of 1966 to fill petitioner's order. The agreement between petitioner and Hatchery did not shift the risk of loss by fire or other cause of the feed covered by the ticket *104 to petitioner; Hatchery was responsible for the feed until delivery. Petitioner and Wilson did not discuss the possibility of refunding a part of the prepayment if petitioner did not require all of the feeds covered by the ticket. From time to time during 1967 petitioner required delivery of feed and other supplies. At those times Hatchery would debit petitioner's account in amounts equal to the prevailing market prices less discounts for the items delivered. On two occasions, February 4 and February 22, 1967, the delivery debit for a ton of Pig Gro Supplement JJ2 was $178 (less $5 discount in the case of the February 4 delivery) notwithstanding Hatchery's purported agreement to hold the price of a ton of this feed to $176 less discount during 1967. The following chart summarizes the items delivered by Hatchery to petitioner during 1967 and the aggregate of debits to petitioner's account: Item
Quantity
Price
Corn
9,494.78 bu.
$13,469.81
Pre Starter
Starter Bracer
5.25 tons
637.20
Pig Grower JJ
7 tons
696.00
Grow Supp JJ2
9 tons
1,528.00
Grow Pork 45
2 tons
292.00
FDP Sow Supplement
7 tons
876.25
Schumacher
17.38 tons
1,093.78
Pro Sweet
1 ton
105.00
Insecticides, Mineral Salt, Dip, Wormer
107.78
Grass Seed 329.80
Totals
$19,135.62
*105 Petitioner received neither preferential treatment nor any advantage over other Hatchery feed customers by reason of his payment on December 31, 1966. Petitioner's feed service and deliveries by Hatchery in 1967 were as prompt as the service and deliveries received by him in 1966. 810 Opinion Petitioner was a farmer and cash basis taxpayer in 1966. On December 30, 1966, petitioner went to Hatchery's office to speack to his long-time friend Wilson about his feed needs for the coming year for his new feeder pig operation. As a result of their discussion petitioner paid Hatchery $20,731 by check on December 31, 1966, for hog feed that was to be delivered at various times in 1967. Petitioner received Hatchery's sales ticket indicating the quantities of certain feeds to be delivered in the future and the prices paid therefor. Petitioner and Wilson agreed that petitioner did not have to take delivery of the exact feeds listed on the ticket and that he could substitute other feeds if the condition of his stock so warranted. The prices listed on the ticket were supposedly maximum prices; petitioner's account with Hatchery was to be charged the prevailing market price at the time *106 of delivery if that price was lower than the ticket price. Petitioner deducted the $20,731 paid to Hatchery as an ordinary and necessary expense under section 162 on his income tax return for 1966. Respondent disallowed the deduction on two grounds: (1) the amount transferred to Hatchery was a deposit rather than a payment; and (2) even if there was a payment in 1966, the payment did not represent an ordinary and necessary expense of petitioner's business. We agree with respondent. Petitioner testified that he believed that he had purchased in a sale completed on December 31, 1966, the hog feeds described on Hatchery's ticket. While petitioner was a candid and credible witness, his description of the substance of the transaction indicates that it was not a completed sale. Petitioner was not required to accept delivery of the feeds listed on the ticket but could substitute other products as conditions warranted. Petitioner was to get the benefit of market prices prevailing at the date of delivery if these were lower than those quoted on the ticket. Petitioner did not bear the risk of loss with respect to the feed until delivery. Although petitioner may have been able to require *107 Hatchery to deliver the feeds listed on the ticket, the record shows that petitioner did not own any feed until it was delivered. The testimony of Wilson also indicated that the year-end transaction was not a completed sale. Although Wilson stated that a completed sale took place in a transparent effort to help petitioner, he admitted that he did not set aside any feed for petitioner after accepting his money, and he was not certain that he had enough feed on hand at the end of 1966 to meet petitioner's order if petitioner had requested immediate delivery of all of the feeds listed on the ticket. For its own accounting purposes Hatchery treated petitioner's payment of $20,731 as a deposit rather than income. We feel that Hatchery's treatment of the payment is relevant as a contemporaneous interpretation of the transaction between the parties. The only factor mentioned by petitioner that tends to show that a completed sale took place in 1966 is that the parties made no provision for return of part of the $20,731 if petitioner did not accept delivery of all of the feeds listed on the ticket. Petitioner stated that he did not believe that he discussed the possibility of a refund with *108 Wilson. We believe this statement is more likely to be true than Wilson's assertion that he would not under any circumstances have given petitioner a refund. Petitioner and Hatchery had long dealt on amicable terms, and there was little doubt that petitioner would use up his payment over a period of time. Accordingly, the parties had no reason to discuss a refund. Even if petitioner's transfer of $20,731 to Hatchery were irrevocable, we fail to see how this fact altered the substance of the transaction. Petitioner merely made a nonrefundable deposit, which is nevertheless a deposit and not a purchase of specific goods. Our view of the transaction between petitioner and Hatchery is that petitioner placed a deposit which could be applied at petitioner's discretion toward the purchase of feed and other products. We note that petitioner has not introduced any memorandum signed by him evidencing his obligation to purchase the feeds listed on the ticket. Accordingly, Hatchery could not have forced him to accept delivery of those feeds. Iowa Code, sec. 554.2201 (1966). Section 162 permits deduction of expenses that are either paid or incurred during a taxable *109 year. A cash basis taxpayer like petitioner cannot be considered to have paid an expense until he had a legal obligation to pay it. Bauer Bros. Co. v. Commissioner, 46 F. 2d 874 (C.A. 6, 1931). On the facts before us we believe that petitioner did not incur any obligation 811 to pay for feed until he requested delivery of specific items in 1967. Therefore, the $20,731 deposited with Hatchery did not represent an expense paid in 1966. Although our holding that petitioner did not pay the $20,731 expense in 1966 is sufficient to sustain respondent's determination, we feel that respondent's alternative contention that the $20,731, if paid in 1966, did not represent an ordinary and necessary expense of petitioner's farming business merits discussion. The parties have devoted the greatest part of the arguments on brief to this contention, and most of the cases involving facts similar to those present here have been decided on the basis of the ordinary and necessary requirement of section 162. John Ernst, 32 T.C. 181 (1959); Cravens v. Commissioner, 272 F. 2d 895 (C.A. 10, 1959), reversing 30 T.C. 903 (1958); Tim W. Lillie, 45 T.C. 54 (1965), *110 affd. per curiam 370 F. 2d 562 (C.A. 9, 1966); and Shippy v. United States, 308 F. 2d 743 (C.A. 8, 1962), affirming 199 F. Supp. 842 (W.D.S.D.,0 1961), ALL INVOLVE FACTS NEARLY SIMILAR TO THOSE PRESENT HERE; HOWEVER, IN THE FORMER TWO CASES YEAR-END PAYMENTS FOR FEED TO BE DELIVERED IN THE FUTURE WERE HELD TO BE ORDINARY AND NECESSARY EXPENSES AND DEDUCTIBLE UNDER SECTION 162 WHILE DEDUCTIONS FOR SIMILAR PAYMENTS IN THE LATTER TWO CASES WERE DENIED. Generally, the factor which distinguishes the cases allowing the deduction from those which disallow it is the existence of some benefit to the taxpayer's business which was acquired by the prepayment. In John Ernst, supra, we found that the taxpayer's year-end payment to a feed dealer for feed to be used in the coming spring benefited his business by providing an assured supply of particular feed. Unlike the agreement under consideration in this case the agreement in Ernst did not permit the taxpayer to substitute other feed or nonfeed products for feed actually ordered. This fact plus the fact the petitioner in Ernst borrowed in order to make the prepayment indicated that it was made *111 for valid business reasons. In Cravens v. Commissioner, supra, the taxpayer's cattle business was threatened by a drought and a shortage of feed in his area. By prepaying for feed to be used in the following year the taxpayer assured himself of preferential treatment from the grain dealer. In reviewing the circumstances in that case the Tenth Circuit noted the following: While the drought may have been out of the ordinary, the avoidance of a distress sale by prepayment for feed to assure preferential delivery is reasonable and has a direct relation to the taxpayer's business. By paying the $50,000 to Superior in advance, Cravens secured an advantage which, so far as the record shows, was not otherwise obtainable. When a commodity, such as cattle feed, is in short supply, an assurance of preferential delivery is important to a man who needs that commodity to stay in business. Because of the benefit that Cravens received from the prepayment, the court found that the prepayment was deductible. The record in this case is devoid of any evidence that petitioner received any benefit from his prepayment or even that he had a reasonable expectation of receiving a benefit. *112 Grain was not in short supply in 1966, and petitioner had no reason to believe that it might be in the future. Hatchery did not ask for petitioner's prepayment, and did not give him any preferential treatment as a result of the prepayment. The existence of the purported purpose of the prepayment, to fix maximum prices to be charged during 1967 for feed, is not borne out by the facts. On two occasions the price that Hatchery charged petitioner for Pig Gro Supplement JJ2 less usual discount exceeded the ticket price less discount. Petitioner contends that the "ordinary and necessary" test of section 162 means only that an expense be appropriate and helpful to be deductible. Welsh v. Helvering, 290 U.S. 111 (1933); Commissioner v. Tellier, 383 U.S. 687 (1966). As a statement of law petitioner's contention is unexceptionable; however, the absence of any proof that petitioner's payment was actually or potentially beneficial to his business indicates that the expenditure was neither appropriate nor helpful. See Tim W. Lillie, supra at 62. In view of the foregoing, Decision will be entered under Rule 50. 812 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩