**Russell MANN and Vivian Mann, Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 72–1761.**

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1973.

Decided Aug. 27, 1973.

---

**674**

William V. Phelan, Iowa City, Iowa, for appellants.

Charles E. Anderson, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HEANEY, Circuit Judge, and TALBOT SMITH, Senior District Judge.*

VAN OOSTERHOUT, Senior Circuit Judge.

This is a timely appeal by taxpayer Russell Mann[1] from the decision of the Tax Court[2] sustaining the Commissioner's determination of a deficiency of $9,957.95 in income tax for 1966. The deficiency arose out of the disallowance of a deduction for payment of $20,731.00 made to Keith Wilson Hatchery, Inc. (Hatchery), on December 31, 1966, for feed to be delivered and used in 1967 in taxpayer's feeder pig operation. Jurisdiction is conferred by § 7482 I.R.C. 1954.

The relevant facts as found by the Tax Court may be thus summarized:

Taxpayer is a real estate broker and a farmer residing at Iowa City, Iowa. He owns a 343 acre farm known as the Mann farm upon which he commenced a feeder pig operation in 1966. Taxpayer had been a regular customer of Hatchery and a long time friend of its presiding officer Wilson. Hatchery was engaged in the business of selling livestock feed and purchasing and selling grain.

On December 30, 1966, taxpayer went to Hatchery's office and talked with Wilson in regard to his feeder pig operation and hog feed requirements for the Mann farm operation for 1967. Following the discussion between taxpayer and

---

* Eastern District of Michigan, sitting by designation.

1. Vivian Mann is a party to this action only because of the filing of a joint return with her husband for the year in issue.

2. Memorandum opinion is published at 31 T.C.M. 808.

Wilson, Hatchery issued and delivered to taxpayer its ticket No. 65968 dated December 30, 1966, which designated taxpayer as "customer" and contained the following pertinent entries:

| Quantity | Description | Price | Amount |
|---|---|---|---|
| 9,350 bu. | No. 2 Yellow Corn | $ 1.42 | $13,277 |
| 1 ton | Pre-starter | 234.00 | 234 |
| 10 tons | Starter Bracer | 134.00 | 1,340 |
| 30 tons | Pig Grower JJ | 108.00 | 3,240 |
| 15 tons | Pig Gro Supp JJ2 | 176.00 | 2,640 |
| | | | $20,731 |

Taxpayer and Wilson agreed that taxpayer did not have to take delivery of the exact amounts of feeds listed on the ticket and that taxpayer could substitute other feeds if the condition of his hogs so required. The prices stated on the ticket did not take into account the usual discount of $5 per ton given to taxpayer or Hatchery's $2 per ton hauling discount. The parties agreed that the prices charged taxpayer upon delivery of the feed would be reduced by these discounts. The prices stated on the ticket were purportedly the maximum price to be charged taxpayer for feed delivered in 1967; however, taxpayer was to be charged market price less discount if that price was lower than the ticket price less discount.

On December 31, 1966, taxpayer delivered to Hatchery his check payable to it in the amount of $20,731. Upon receipt thereof, Hatchery issued and delivered to taxpayer its ticket No. 65971 dated December 31, 1966, which designated taxpayer as "customer", contained a check mark in a square space entitled "on acct.", and further contained the following entries:

| Description | Amount |
|---|---|
| Corn and Feed | $20,731 |

For its accounting purposes, Hatchery treated taxpayer's payment of $20,731 as a deposit rather than as income.

No portion of the grain and feed items listed in ticket No. 65968 issued by Hatchery was delivered to or received by taxpayer during the calendar year 1966.

After receiving taxpayer's payment, Hatchery did not set aside the amounts of feed stated in the tickets or charge taxpayer for storage of the feed. At trial, Wilson could not recall whether Hatchery had enough feed on hand at the close of 1966 to fill taxpayer's order. The agreement between Hatchery and taxpayer did not shift the risk of loss by fire or other cause of the feed covered by the ticket to taxpayer; Hatchery was responsible for the feed until delivery.

Taxpayer and Wilson did not discuss the possibility of refunding a part of the prepayment if taxpayer did not require all of the feeds covered by the ticket. No refund was ever claimed or made.

From time to time during 1967, taxpayer required delivery of feed and other supplies. At those times, Hatchery would debit taxpayer's account in amounts equal to the prevailing market prices less discounts for the items delivered. On two occasions, February 4 and February 22, 1967, the delivery debit for a ton of Pig Gro Supplement JJ2 was $178 (less $5 discount in the case of the February 4 delivery), notwithstanding Hatchery's purported agreement to hold the price of a ton of this feed to $176 less discount during 1967.

The following chart summarizes the items delivered by Hatchery to taxpayer during 1967 and the aggregate of debits to taxpayer's account.

| Item | Quantity | Price |
|---|---|---|
| Corn | 9,494.78 bu | $13,469.81 |
| Pre Starter | | |
| Starter Bracer | 5.25 tons | 637.20 |
| Pig Grower JJ | 7 tons | 696.00 |
| Grow Supp JJ2 | 9 tons | 1,528.00 |
| Grow Pork 45 | 2 tons | 292.00 |
| FDP Sow Supplement | 7 tons | 876.25 |
| Schumacher | 17.38 tons | 1,093.78 |
| Pro Sweet | 1 ton | 105.00 |
| Insecticides, Mineral Salt, Dip, Wormer | | 107.78 |
| Grass Seed | | 329.80 |
| Totals | | $19,135.52 |

The balance of taxpayer's payment was used by by feed deliveries made to the taxpayer early in 1968. Taxpayer treated the December 31, 1966, payment of $20,731 to Hatchery as a deductible

business expense on his 1966 income tax return. The Commissioner disallowed the deduction on two grounds: First, that the amount so transferred represented a nondeductible deposit which was to be applied against future purchase of feed and, thus, did not constitute the payment of a current expense. Secondly, that even if the disbursement constituted the payment of an expense attributable to 1966 rather than an advance deposit, it was not an "ordinary and necessary" expense of taxpayer's business for that year, and, therefore, was not deductible under Section 162(a) of the Code. The Tax Court sustained the Commissioner's determination on both grounds.

Taxpayer as a basis for reversal urges that the Tax Court's determination on both issues is clearly erroneous. Taxpayer's position on such issues is, (1) the December 31 transaction constitutes a valid contract for the sale of the feed and taxpayer's $20,731 check constitutes full payment of the contract price, and (2) the payment was an ordinary and necessary expense within the meaning of § 162 I.R.C. 1954.

■ We agree with taxpayer on both issues and reverse the judgment of the Tax Court for the reasons hereinafter stated.

There has been, and continues to be, a great deal of confusion regarding the propriety of deducting prepaid expenses in the year of payment. The results have varied depending on the expense item in question. *See, e. g.,* Maple v. CIR, 440 F.2d 1055 (9th Cir. 1971) (prepaid tree growing services); Waldheim Realty & Inv. Co. v. CIR, 245 F. 2d 823 (8th Cir. 1957) (prepaid insurance premiums); Williamson v. CIR, 37 T.C. 941 (1962) (prepaid delay rental payments in connection with oil and gas lease); Duffy v. Central N.J.R.R. Co., 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846 (1925) (additions to leased property); 4A Mertens Law of Federal Income Taxation § 26.14 (1972 rev.) (prepaid interest); Rev.Rule 71–190, CB 1971–1, p. 70, superseding IT 4054, CB 1951–2, p. 36 (prepaid state taxes); Main & McKinney Bldg. Co. v. CIR, 113 F.2d 81 (5th Cir. 1940) (prepaid rent); University Properties, Inc., 45 T.C. 416 (1966), affd., 378 F.2d 83 (9th Cir. 1967) (prepaid rent). *See also* cases cited at Cravens v. CIR, 272 F.2d 895, 899 n.16 (10th Cir. 1959). There is clearly no common thread or governing principle which rationalizes and renders predictable the results concerning deductibility of advance payments in general. However, special theories and practices have developed which govern the tax treatment of advance payments for livestock feed. *See* Hawkinson, Farm Expenses and General Accounting Principles, 22 Tax Law Review 237, 245 (1967); Pinney & Olson, Farmers' Prepaid Feed Expenses, 25 Tax Lawyer 537 (1972) (hereinafter cited as Pinney). It is this special area of advance payments for which exploration is merited by the instant case.

The question of the proper tax treatment for advance payments for livestock feed apparently first arose in Des Moines, Iowa, in 1943. In a letter ruling, the Deputy Commissioner stated:

"In the case of a taxpayer on the cash receipts and disbursements basis, the amounts expended for feed should be deducted as an expense *in the year in which the feed is paid for, irrespective of the fact that it may not be consumed until the following year.*" Pinney at 539, citing Prentice-Hall Federal Tax Service ¶ 66,149 (1944).

There was a relative peace until the case of Ernst v. CIR, 32 T.C. 181 (1959) (acquiescence, 1959–2 C.B. 4). Ernst made large advance payments for poultry feed in December of 1948 and 1949. The deductions were disallowed for the years in which the payments were made. The Tax Court held against the Commissioner, stating:

"The payments were absolute and petitioner . . . was irretrievably out of pocket the amounts paid. . . ." 32 T.C. at 186.

In another 1959 case, Cravens v. CIR, 272 F.2d 895 (10th Cir. 1959), the taxpayer also prevailed. In December 1953, Cravens paid $50,000 for feed to be supplied in 1954. The Tenth Circuit held against the Commissioner on the basis that there was a binding contract and on the basis that a danger of feed shortages formed a valid "business purpose" for the advance payment.

The next case involving advance payments for feed was decided in 1961. Shippy v. United States, 199 F.Supp. 842 (W.D.S.D.1961), affd., 308 F.2d 743 (8th Cir. 1962). Shippy paid $23,000 in advance for feed to be delivered in the future as needed. For the first time, the Commissioner's determination of a deficiency was upheld. The District Court noted that the expenditure created "an asset having a useful life extending substantially beyond the close of the taxable year. . . ." 199 F.Supp. at 843. It also relied on the absence of prior consistent practice and the fact that "no preferential treatment" was secured by the advance payment. *Id.* Finally it held the transfer of money was in fact a refundable deposit rather than a payment pursuant to a binding contract. This court affirmed almost exclusively on the latter ground, although some attention was given to the absence of prior consistent practice.

In 1965, the Commissioner won another victory. Lillie v. CIR, 45 T.C. 54 (1965), aff'd. per cur., 370 F.2d 562 (9th Cir. 1966). Again, the conclusion that the money transfer was a refundable deposit rather than a true payment was a crucial factor. An additional, and novel, factor was that charges for some services were bound up in prepaid fee. 45 T.C. at 63.

In Estate of Frank Cohen, T.C. Memo. 1970–272, deductions were claimed for advance payments made pursuant to two separate feed sale contracts. Deductions were allowed with respect to one contract and denied as to the other. In both determinations the crucial question was whether the money transferred constituted a refundable deposit. As in *Lillie,* some reliance was placed on the inclusion of services as part of the consideration for the prepayment.

Finally, another taxpayer victory occurred in Gaddis v. United States, 330 F.Supp. 741 (S.D.Miss.1971). Once again a predominant consideration was the court's conclusion that the prepayment was not a refundable deposit. The court placed some reliance on the fact that "there was no provision . . . for services to be rendered." 330 F. Supp. at 752.

In addition to the case law summarized above, a new theory has been propounded by the Internal Revenue Service Los Angeles District Director to the effect that, regardless of any other factor, no prepaid feed expense is deductible unless the feed "is in existence at the date of purchase in the form it is fed to the animals." Los Angeles District Director, News & Notes for the Tax Practitioner (Number 72–1), *cited in* Pinney at 546. This position is based on the theory that "goods *must be both existing and identified* before any interest in them can pass." *Id.* That such theory is given support by the Tax Court is evidenced by its reliance on Wilson's admission that he did not "set aside any feed for petitioner after accepting petitioner's money and was not certain that he had enough on hand at the end of 1966 to meet petitioner's order if petitioner had requested immediate delivery of all the feeds listed on the ticket." *See* 33 Am.Jur.2d Federal Taxation ¶ 7574 (Supp. 1973).

Concerning the new factor, promulgated by the Los Angeles District Director, none of the six cases summarized above has placed any reliance upon it. *Ernst* notes that the feed in that case was not existing at the time of the payment, yet upholds the deduction. For cash basis taxpayers, § 162(a) limits deductibility of expense items to instances where payment has been made; there is no provision in the Code or elsewhere which conditions deductibility on the passage of "title." *See* Pinney at 546–48. The Los Angeles District Director's position is

wholly untenable. The Tax Court's reliance on this factor in the instant case was error.

We address first the question of whether taxpayer's transfer of the money to Hatchery was a payment or, as the Commissioner contends, a mere deposit. The Tax Court at one point states that taxpayer made a "nonrefundable deposit, which is nevertheless a deposit and not a purchase of specific goods." The Random House Dictionary defines deposit as "anything given as security *or in part payment*." Random House Dictionary 388 (unabridged ed. 1971) (emphasis added). An example following this definition makes clear the two alternate meanings of the word: some deposits "given as security" are refundable; other deposits given "in part payment" are the type which are not refundable. We think both the Dictionary definition and the common usage of the word clearly suggest that a nonrefundable deposit is, quite simply, a payment. If the deposit is nonrefundable, then the taxpayer is "irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident to 'carrying on a trade or business.'" Ernst v. CIR, *supra,* at 186. With certain exceptions not applicable here, unqualified delivery of a check constitutes "payment at the time of delivery, when the check is subsequently cashed or deposited." 2 Mertens Law of Federal Income Taxation § 12.54 (rev.ed.1967 & 1973 Cum.Supp.) If the Tax Court is correct in its conclusion that this delivery of a check constituted a nonrefundable deposit, then the deduction must be upheld.

■ The key to this question is refundability. The Tax Court found "that the parties made no provision for return of part of the $20,731 if petitioner did not accept delivery of all the feeds listed on the ticket." This finding is clearly supported by the evidence in the record. Yet the Tax Court, in a subsequent statement somewhat inconsistent with its earlier apparent conclusion that this deposit was not refundable, strongly implies that this deposit was refundable. The court states:

"Our view of the transaction between petitioner and Hatchery is that petitioner placed a deposit which could be applied at petitioner's discretion toward the purchase of feed and other products. We note that petitioner has not introduced any memorandum signed by him evidencing his obligation to purchase the feeds listed on the ticket. Accordingly, Hatchery could not have forced him to accept delivery of these feeds. Iowa Code, Sec. 554.2201 (1966). ¶ 72,163. P-H Memo TC at 846 (1972).

The Iowa Code section cited by the Tax Court is the U.C.C. statute of frauds provision. It is fairly clear that the writings in this case are not sufficient to comply with Iowa Code § 554.2201(1). *Cf.* Cohn v. Fisher, 118 N.J.Super. 286, 287 A.2d 222 (1972); Jinright v. Russell, 123 Ga.App. 766, 182 S.E.2d 328 (1971). Nevertheless, Iowa Code § 554.-2201(3) provides that "[a] contract which does not satisfy the [writing] requirements of subsection (1) but which is valid in other respects is enforceable . . . with respect to goods for which payment has been made and accepted. . . ." The Tax Court apparently felt that this exception was available only when the party seeking to enforce the contract is the same party which rendered the partial performance. According to this interpretation, the contract could be enforced by Mann against Hatchery but not by Hatchery against Mann. There is some support for this view in the cases. *See* In re Flying W Airways, Inc., 341 F.Supp. 26 (E.D.Pa.1972). However, the clear majority view is that the partial performance exception renders the contract enforceable by either party. *See* Cohn v. Fisher, supra; Lake Village Implement Co., Inc. v. Cox, 478 S.W.2d 36 (Ark. 1972). This view is consistent with the U.C.C. comments which provide that:

"Receipt and acceptance either of goods or of the price constitutes an

*unambiguous overt admission by both parties that a contract actually exists."* (Emphasis added).

Moreover, and more importantly, this court has already adopted this view and, in the absence of a controlling state supreme court case to the contrary, we see no reason to depart from it. *See* Augustin Bros. Co. v. Wright Grain Co., 460 F.2d 376 (8th Cir. 1972).

Both taxpayer and Wilson unequivocally testified they entered into a binding contract for the sale of the feed. There is no substantial evidence to the contrary. The Tax Court concedes the credibility of the witnesses. The court states: "Although petitioner may have been able to require Hatchery to deliver the feeds listed on the ticket, the record shows that petitioner did not own any feed until it was delivered." The Tax Court by such statement impliedly concedes a valid contract was entered into on December 31. Passing title to the feed is not an essential element of a binding contract to sell feed. Taxpayer's December 31 payment represents the payment of the contract price for the feed that his contract obligated him to purchase. This case is a stronger case for the taxpayer factually than *Cravens, supra.* The court in *Cravens* states:

"Under the contract the dates of delivery were not fixed, the prices were to be those prevailing on the dates of delivery, the quantities could have been varied 'to any reasonable extent,' and if the advance payment had exceeded the ultimate cost, Cravens would have been entitled to a refund. These factors are urged as establishing that there was no firm contract of sale and purchase and, hence, no obligation to pay the $50,000 in 1953. *The answer is that the contract was binding and carried out by the parties."* Cravens v. CIR, supra, 272 F.2d at 898 (emphasis added).

We hold that the finding of the Tax Court that the check delivered by taxpayer to the seller on December 31, 1966, did not constitute payment is clearly erroneous.

The remaining issue is whether the Tax Court's determination that the payment made did not constitute an ordinary and necessary business expense for 1966 is clearly erroneous. The governing statute, § 162 I.R.C. 1954, reads:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, . . . "

We have heretofore cited and discussed cases dealing with the application of this section to various feed payments made by farmers.

The Tax Court was of the view that no business purpose was served by the payment made because of its determination that the taxpayer received no maximum price guarantee and hence taxpayer received no benefit from the advance payment. In support of such determination, the court relies on two isolated instances where the taxpayer paid $2.00 a ton above the agreed maximum price on one-ton purchases of mixed feed. Taxpayer contends that one of the $2.00 alleged overcharges was adjusted by a subsequent credit. The record tends to support such contention. Apart from the two asserted $2.00 overcharges, there is no evidence that any charge was made for any item in excess of the price guaranteed. Whether or not the credits were made, we believe the overcharges aggregating no more than $4.00 on a $20,000 transaction could well have been made by mistake on the part of the seller and overlooked or waived by the taxpayer. In any event, such trivial variation is not persuasive on the price guarantee when viewed in the light of the record as a whole. The unequivocal testimony of both the buyer and the seller is that the contract prices stated in the invoice are guaranteed maximum prices. Such guarantee was a benefit to the taxpayer as it protected him against a price rise in the event the market price went up. Additionally, upon the basis of the

valid contract, taxpayer was in a preferred position to insist upon and receive delivery of the items purchased in case of a feed shortage. It was of course impossible in December 1966 to predict with any certainty the crop conditions or feed prices for the following year. This is well-illustrated by the rapid rises in grain and feed prices that have taken place in recent months. It was entirely reasonable for the taxpayer to obtain assurance by means of a contract as to his feed costs before determining the scope of his operation. The court's determination that the contract and advance payment served no business purpose is clearly erroneous.

We find no substantial support in the cases heretofore cited treating with the deduction of feed expenses to support the Government's contention that a benefit to the taxpayer is necessary to support the timing of a business expense deduction which meets the terms of § 162(a) in a situation where, as here, payment is made pursuant to a binding contract. Such issue need not be decided to resolve this case in light of our determination that a benefit to the taxpayer has been established.

A comparison of the invoice and the feed supplied indicates that the taxpayer's estimated need for feed in 1967 reflected by the invoice was reasonable. The principal item involved is corn. Taxpayer received corn in an amount slightly above the amount stated in the invoice. Buyer and seller had agreed that substitutes could be made to fit the buyer's needs.

It is entirely possible that taxpayer's feed purchase may have been influenced by tax savings motives. In *Shippy*, we

stated: "With the contention that tax motive is unimportant if taxpayer does that which the law permits, we agree." 308 F.2d at 747. To like effect, *see Cravens*, 272 F.2d at 898; *Gaddis*, 330 F. Supp. at 755.

For a cash-basis taxpayer, the time of deductions under § 162(a) for expense of carrying on a business operation is simple. Business expenses are deductible when paid. It is the items for which the expense is incurred that must meet the ordinary and necessary test, not the timing of the payment. The Government does not contend that the invoice feed is not a necessary business expense in a pig feeding operation. The contention is that 1966 is not the appropriate year for the claimed deduction.

Section 446 I.R.C.1954 provides:

"General rule for methods of accounting.

(a) General rule.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

No issue is here raised that the cash method of accounting uniformly used by the taxpayer did not properly reflect his income. No determination was made by the Commissioner or the Tax Court that the taxpayer's method of accounting did not properly reflect income.[3] Similarly,

3. In Security Flour Mills Co. v. CIR, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944) the Supreme Court holds that the clearly-reflect-income language of § 446 (b) "was not intended to upset the well understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of

the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer." *Id.* at 285–286, 64 S.Ct. at 598.

In applying the cash accounting method, "[t]he uniform result has been denial

no contention is here made that the feed purchase covers taxpayer's needs for an excessive period of time such as to require capital expenditure treatment under § 263(a)(1).

The two statutes last referred to constitute limitations on business expense deductions but need not here be considered since no contention is made in this case that these statutes have been violated. *See* Commissioner v. Transport Manufacturing & Equipment Co., 478 F.2d 731 (8th Cir. Apr. 20, 1973). Neither the Commissioner nor the Tax Court has placed any reliance upon such sections.

Our determination on the record as a whole that the feed purchase here involved was an ordinary and necessary business expense within the meaning of § 162(a) is supported by *Ernst, Cravens, Gaddis* and *Cohen,* supra.

The *Cravens* court states:

"In the case of farmers and cattle raisers the use of a transactional basis for the computation of income would bring confusion into the federal tax system. The treatment of the cost of seed, fertilizer, and feed purchased in one year for use in the next year is simple if the deduction is allowed when paid if the cash basis applies or when incurred if the accrual basis is used." 272 F.2d at 900–901 (footnote omitted).

In *Gaddis,* the court agreed with testimony which asserted

"that if the plaintiff were required to charge expense of chicken feed as it were delivered or as the chickens consumed it. rather than as it was paid for, this would amount to a 'real burdensome type of operation' and that it would not be possible to trace this feed through a perpetual inventory from the time it was purchased until it was

delivered to the Breeder Farm and would be inconsistent with the cash method of accounting. . . ." 330 F.Supp. at 758.

The *Gaddis* court further states:

It would be ludicrous for this Court to doubt for one second that the purchase of the chicken feed ingredients by the plaintiff in its large chicken-producing and inter-related activities was not appropriate and helpful for the development of its business of raising and feeding large flocks of chickens for sale on the market. Certainly this was an ordinary as well as a necessary expense. . . ." 330 F.2d at 757.

Our decision in this case is not in conflict with our decision in *Shippy.* In that case there was positive testimony by the seller that taxpayer's check was intended as a deposit and not as a payment. There are additional factual distinctions. We expressed no disagreement with the law as stated in *Ernst* and *Cravens* but based our decision upon our determination that the court's decision, that the contract for the sale of the feed had not been consummated, was supported by substantial evidence. In our present case we have hereinabove determined that on the record before us the payment was final and was made pursuant to a valid, binding, enforceable contract.

In the present case, we find no substantial evidence to support the Tax Court's determination that the December 31, 1966, payment did not constitute an ordinary and necessary business expense in the operation of the taxpayer's feeder pig business. We hold that the payment represented a business expense deductible in 1966.

The judgment of the Tax Court is reversed.

both to Government and to taxpayer of the privilege of allocating income or outgo to a year *other than the year of actual*

*receipt of payment.* . . ." *Id.* at 286–287, 64 S.Ct. at 599 (emphasis added).