OSCAR A. DE LA CRUZ and OPALINE N. DE LA CRUZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De La Cruz v. Commissioner
Docket No. 1664-75.
United States Tax Court
T.C. Memo 1978-8; 1978 Tax Ct. Memo LEXIS 506; 37 T.C.M. (CCH) 24; T.C.M. (RIA) 780008; January 9, 1978; Filed *506 Held, petitioner is entitled to a deduction in his taxable year 1970 for feed purchased in that year. The feed was consumed in 1970 and in the first 45 days of 1971. Held further, petitioner is entitled to a deduction in 1970 for expenditures made in that year for services to the extent that such services were actually performed therein. Such deductions do not materially distort petitioner's income that year. Henry W. Walther, for the petitioners. Richard W. Kennedy, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on November 27, 1974, issued *507 a statutory notice of deficiency in which he determined a deficiency in petitioners' Federal income tax for the calendar year 1970 in the amount of $12,464.72. This deficiency was determined without regard to petitioners' amended return filed September 1, 1971 in which petitioners withdrew their claim for $15,965 of the $32,425 that had been claimed in the original return. Pursuant to the amended return petitioners paid an additional $5,212.89 in taxes. After taking this adjustment into consideration the following items claimed as schedule F farm deductions by petitioners remain in dispute: Item
Amount
Feed expense
$13,270
Management fees
800
Service expense
1,760 leaving an outstanding deficiency of $7,251.83 ($12,464.72 deficiency re statutory notice less $5,212.89 tax paid but not accounted for in respondent's calculations). The issues under consideration are: whether $13,270 paid in 1970 for cattle feed constituted a valid section 162 [1] expense for that year or a nondeductible deposit; whether $2,560 expended on management and service fees in 1970 constituted a valid section 162 expense for that year or a nondeductible deposit; whether an allowance *508 of these items as deductions in petitioners' 1970 taxable year would materially distort petitioners' income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Petitioners Oscar A. De La Cruz and Opaline N. De La Cruz, husband and wife, resided in Santa Ana, California at the time the petition herein was filed. Their joint Federal income tax return for the taxable year 1970 was timely filed with the internal revenue service center, Ogden, Utah. Petitioners subsequently filed an amended return for that year. Petitioners maintain their books and records and report for Federal income income tax purposes according to the calendar year and cash method of accounting. Opaline N. De La Cruz is a party to this action only because she joined in the filing of this return and, accordingly, Oscar N. De La Cruz will hereinafter be referred to as petitioner. Petitioner is a physician, specializing in ear, nose and throat. In October of 1970 *509 petitioner entered into a farm venture. To this end and at that time he paid his agent, Prudential Cattle Company (Prudential), $4,400. In addition, he gave Prudential a limited power of attorney to borrow up to $35,000. Of the $4,400, $700 was retained by Prudential as a management fee while the remainder was used as a down payment on the purchase price of 100 head of cattle. Pursuant to the power of attorney Prudential, on November 16, 1970, borrowed $16,000 as evidenced by a note for that amount. The $16,000 was borrowed from Kershaw & Sons, Inc. (Kershaw), a cattle feeding company, and was used to purchase feed from them, to prepay feedlot services and to prepay interest on this loan. At that time Prudential estimated that petitioner's expenses for the calendar year 1970 would be as follows: Item
Amount
Feed
$13,270
Interest
630 [2]
Services
1,760
By purchasing, on November 16, 1970, the entire estimated feed requirements for the 100 head of cattle for the predicted 3-to-4 months fattening time, petitioner fixed the feed price and reduced the amount of activity on his part necessary to the cattle operation. In addition, *510 petitioner received a discount on the feed in the amount of $503 at the time of purchase. The actual costs for the entire transaction were as follows: Item
Amount
Feed expense
$13,270.00
Interest
1,354.75
Veterinary
58.39
Feedlot services
2,207.09
Property taxes
100.66
$16,990.89
On the same date 100 head of cattle were purchased in petitioner's name. The cattle and feed were held at Kershaw's feedlot in Brawley, California. When petitioner inspected the arrangements at Kershaw's he found that they had segregated his feed and cattle. Of the 100 head of cattle purchased one died on October 11, 1970, [3] 81 were sold on February 11, 1971, and 18 were sold on February 14, 1971. After their sale the feed that the cattle had not consumed, 31.7 tons, was sold to the feedlot for $1,682.75. This was 12.7 percent of the feed originally purchased. [4] The average sale price per ton was $53.08 which was the average cost per ton to the petitioner for his 1970 purchase. *511 Petitioner also made preliminary arrangements for a cattle feeding transaction with the L. D. Stensvad Cattle Company. Pursuant to this transaction petitioner paid Prudential $5,400. Based on the two transactions petitioner claimed farm deductions as follows: Item
Claimed on Return
feed expense
$27,135
management fees
1,400
service expense
1,760
interest
2,130
$32,425 The L. D. Stensvad Cattle Company venture was cancelled. The necessary feed was purchased, but the cattle were not. Petitioner believed that the failure to complete the contract resulted in its abrogation. He requested a return of his payment, and all but $100 was in fact returned. Subsequently, petitioner amended his tax return to reflect the cancellation of this transaction. Thus, all of the disputed expenses relate to the transaction between petitioner and Kershaw & Sons, Inc. with the exception of $100 of the claimed management fee which relates to the abortive transaction with L. D. Stensvad Cattle Company. Of the claimed deductions respondent allowed only the interest, in the amount of $630, paid on the $16,000 feedlot note. OPINION Respondent agrees that petitioner was *512 a farmer engaged in the cattle raising business for all relevant periods and that he is entitled to section 162 deductions for the expenses related thereto. The issue before us is the timing of these deductions. We have no doubt that petitioner's motivation to engage in the transaction at issue was, to a large extent, the minimization of what would otherwise have been a substantial, personal tax liability. However, if we find, and we do, that petitioner nonetheless intended to make a profit from the transaction then he is entitled to his deductions unless they are otherwise improper. There is no shortage of cases respecting the purchase of feed. They indicate a dichotomy between payments and deposits and evidence a concern with respect to the business purpose of the transaction and the possibility that a deduction of feed costs may materially distort income. We are hindered in our determination by the extent of the evidence presented. Although there obviously was a contract between petitioner and Prudential and one between Prudential and the feedlot, we have before us neither the written contracts nor concise testimony of exactly what these contracts encompassed. Fortunately *513 for petitioner, we do have a copy of the note of November 16, 1970 by which petitioner borrowed $16,000 from Kershaw & Sons, Inc. and the invoice of the same date specifically setting forth the quantity of feed purchased and the price per ton to be charged for that feed along with charges for interest on the loan and feedlot services all totalling $16,000. The $16,000 figure was reached after Kershaw deducted a discount on the total charges. Therefore, by working backward, we can find that the total amount expended for feed out of the $16,000 liability was $13,270. Respondent contends that this payment was a deposit. In Mann v. Commissioner,483 F.2d 673 (8th Cir. 1973), the Eighth Circuit goes into great detail with reference to the connection between refundability and deposits. Suffice it to say here that they concluded that a nonrefundable deposit constitutes a payment. The documents before us support petitioner's assertion of a nonrefundable payment or an outright purchase of feed. Petitioner paid for the feed by becoming legally bound to pay the $16,000 negotiable note. We do not find the refund of petitioner's down payment on the cancelled transaction *514 to indicate that the purchase herein could be retracted. The cancellation arose due to failure on the part of the third party to perform. Neither does the resale of the excess feed to the feedlot suggest a deposit. The feed was perishable. If sold elsewhere it would have to be transported. The resale appears to have been the result of a valid business judgment. The feed invoice was specific with respect to both quantity and price of the feed to be delivered, no adjustment was to be made with respect to the amount of weight gained by the cattle, petitioner's loss was not limited, and the feeder did not bear the risk of the market on the unused feed. Thus, we find E. Keith Owens v. Commissioner,64 T.C. 1 (1975) to be distinguishable on its facts. Further, refundability is not resultant merely because the feedlot could subsequently vary the feed based on directions from the veterinarian. Mann v. Commissioner,supra.In sum, petitioner had made a nonrefundable payment in 1970 for a specified type and quantity of feed. See Gaddis v. United States,330 F. Supp. 741 (D.C., S.D.Miss. 1971). We have no evidence before us indicating *515 exactly when the feed was delivered. The feedlot from which the feed was purchased was the feedlot which held and cared for the cattle. Petitioner testified that he visited the feedlot and saw cattle and feed segregated under his name. He did not testify as to the date of his visit. However, it is safe to assume that the feed was delivered in 1970 because the cattle, retained for an average of 87.5 days [5] 45 of which were in 1970, obviously consumed a material portion of the feed in that year. Respondent asserts that no valid business purpose exists for the purchase in 1970. We do not agree. The purchase price fixed the price of the feed. [6] In addition, the cattle were purchased November 16, 1970 with a predicted retention period of 3-to-4 months. The actual retention period averaged 87.5 days, over half of which fell in the taxable year 1970. Petitioner did not wish to deal with the cattle venture on a day-to-day basis. He hired Prudential as his agent, thus minimizing the necessary contacts. Considering *516 both the expectancy of a short period of ownership and petitioner's desire to minimize his involvement with the day-to-day feeding operations, we do not find the lump sum purchase to be unwarranted. For these reasons we find the situation at hand distinguishable from Shippy v. United States,308 F.2d 743 (8th Cir. 1962) and Lillie v. Commissioner,45 T.C. 54 (1965), affd. per curiam 370 F.2d 562 (9th Cir. 1966). Neither do we find a gross over-purchase of feed on petitioner's part. There remained 31.7 tons of feed after the cattle were sold. This was 12.7 percent of the original purchase. The predicted period for retention of the cattle was 3-to-4 months. They were to be held until they reached between 1,100 and 1,200 pounds. At that time better business practices dictated immediate disposition both to minimize consumption of feed and because this was the optimum weight for resale. The actual period of retention was less than 3 months. There is no doubt that if it had been necessary to retain the steers an additional *517 month, the 31.7 tons would have been consumed. [7]
Finally, we cannot agree with respondent's argument that the deductions of feed costs will result in a material distortion of income. We have found that there was a business purpose supporting the purchase. The major portion of the feed was consumed within the taxable year in which the deduction was taken or within the first 45 days of the following year. Thus, the "useful life" of the feed as an asset did not "extend substantially beyond the close of the taxable year" in which the deduction was taken. [8]
Our finding the November purchase of feed to be a legitimate section 162 deduction for 1970 is supported by the Supreme Court in United States v. Catto,384 U.S. 102, 106 (1966), wherein section 1.162-12, Income Tax Regs., [9] was interpreted to "grant a current deduction for the expenses incurred in raising livestock, without regard either for the purpose for which the animals are raised or for the method of accounting employed by the taxpayer." [9]
*518 Petitioner had no customary practice in conducting his livestock operations because this was the first taxable year in which he became involved in such an operation. We see no need to penalize taxpayers for branching out into new business ventures. Any distortion existing for the taxable year 1970 will even out as petitioner continues to operate in the livestock field. See Gold-Pak Meat Co., Inc. v. Commissioner,522 F.2d 1055 (9th Cir. 1975). Respondent also objects to petitioner's claim of a farming deduction in 1970 for management and service fees.
The total costs of these fees were as follows: Item
Charge
Veterinary
$ 58.39 $
Services and yardage
2,207.09
2,265.48
Property taxes
100.66
Management
800.00
$3,166.14 Petitioner did not refer to property taxes in his claimed farming deduction. We will, therefore, disregard these amounts in our discussion. Of the total $2,265.48 for feedlot services petitioner deducted $1,760 for his taxable year 1970. He also deducted 100 percent of the management fee. There is no question that petitioner expended $800 for management fees and $2,100 for feedlot services in 1970. *519 Seven hundred dollars ( $700) of the $800 was retained by Prudential out of the $4,400 petitioner paid on October 5, 1970. The remaining $100 was the fee retained by Prudential in connection with the L. D. Stensvad Cattle Company transaction. The $2,100 was included in Kershaw's $16,000 charge that gave rise to the loan previously discussed. However, compensation for services is not deductible prior to the time that those services are rendered. Section 1.162-7(a), Income Tax Regs.
Respondent classified the $700 payment as a "deposit for the payment of services to be provided in the future" which "is deductible only when the services are performed." Additionally, he contends that, because petitioner made no monetary allocation between the services performed in 1970 and those performed in 1971, the fees are not deductible in 1970. Petitioner testified that the major portion of Prudential's activity concerned the inceptual organization of the farm venture. He testified that their only 1971 activity was the financial summation of the venture. In addition, he testified that the April 27, 1971 report on income and expenses for 1970 and 1971 accurately reflects the costs of the *520 services performed in those years. While we do not accept petitioner's apportionment of these expenses neither do we find respondent's allocation accurate. The $100 fee paid in connection with the L. D. Stensvad Cattle Company operation was paid to Prudential as agent for petitioner. The venture was organized in 1970, feed was purchased at an unspecified time, and the venture was dissolved in 1971. No connection was made between the payment and either the year or the act for which the fee was paid. Petitioner had not met his burden of proof as to the timing of these services. Welch v. Helvering,290 U.S. 111 (1933).For this reason we cannot characterize the $100 as payment for a service performed in 1970. Section 1.162-7(a), Income Tax Regs. The fee is, therefore, deductible in 1971. The $700 management fee was expended in connection with the Kershaw feedlot operation. The fee was paid to Prudential for acting as petitioner's agent in the organization of this transaction during 1970 and for their final accounting report submitted to petitioner in April of 1971. While there is scant evidence before us regarding the services performed by Prudential and *521 the timing thereof, we find that half the $700 fee is attributable to services performed in 1970. During that year Prudential's organizational activities consisted of selecting the cattle, selecting the cattle feeder, securing the loan, and completing the necessary papers. Once organized, the cattle operation was midway to completion by the end of that taxable year. The only service attributable to Prudential in 1971 was the final accounting. This expense may be characterized as ordinary and necessary and does not cause a material distortion in income. We therefore find a valid 1970 deduction for management fees in the amount of $450. Respondent's contention that the $2,100 expended in 1970 for feedlot services is solely attributable to 1971 is ludicrous. For the 90 days during which all or some of the cattle were held at the feedlot, Kershaw's was the sole provider of their needs. The expenses for feedlot services were ordinary and necessary and do not cause a material distortion of petitioner's income in 1970. We find, therefore, that the total cost of such services should be apportioned on a per diem per steer basis. Section 1.162-7(a), Income Tax Regs. Thus, the proper *522 1970 deduction for feedlot services is $1,164.50. [10]
Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. For 1970 and 1971.↩
3. We have no information as to why this steer was included in those purchased by petitioner on November 16, 1970. ↩
4. We have no information as to what kinds of feeds were left or their amounts.↩
5. Eighty-one steers were held 87 days (from November 16, 1970 until February 11, 1971) and 18 steers were held 90 days (from November 16, 1970 until February 14, 1971).↩
6. Although we have no evidence that he was correct, petitioner believed the cost of feed was on the increase.↩
7. 218.3 tons were consumed over 90 days. Thus, the average consumption rate exceeded 2.4 tons per day.↩
8. See sec. 1.461-1(a), Income Tax Regs.↩
9. Sec. 1.162-12(a)↩. * * * The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *.
10. 45 days X 99 steers = 4,455, 4,455 plus (42 days X 99 steers = 4,158) plus (3 days X 18 steers = 54) = 8,667 4,455/8,667 X $2,265.48 = $1,164.50.↩